**ORIGINAL**

FILED IN CLERK'S OFFICE

NOV 2 4 2003

LUTHER _____ Clerk
By: _____
Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| IN RE AFC ENTERPRISES, INC. | ) | Consolidated Civil Action |
| DERIVATIVE LITIGATION | ) | No. 1:03-CV-1584-TWT |
|  | ) |  |

## CONSOLIDATED AMENDED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION, AND FOR VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002

I.

### NATURE OF THE ACTION

1.      This is a shareholders' derivative action brought in the right of, and for

the benefit of, nominal defendant AFC Enterprises, Inc. ("AFC" or the "Company")

against its entire Board of Directors (the "Board") (as of the date the first action was

filed), certain top officers, and its current and past controlling shareholders, seeking to

remedy defendants' breaches of fiduciary duties and other violations of law which

have exposed the Company to millions of dollars in potential liability for violations of

state and federal law and have inflicted millions of dollars more in harm to AFC's

reputation, goodwill, and standing in the business and investment communities. These

actions arise out of defendants' violations of law in causing AFC to issue false and



misleading financial statements which overstated AFC's earnings between Fiscal Year ("FY") 2000 and April 22, 2003 (the "Relevant Period"), forcing the Company to restate and erase millions of dollars in previously reported earnings all the way back to FY 2000 – at great harm to AFC's credibility. Defendants also breached their fiduciary duties by causing the Company to conduct an initial public stock offering during the Relevant Period while the Company's stock price was artificially inflated based on the earnings misstatements in order to facilitate the sale of millions of dollars worth of stock by defendants and other insiders. Though the Company has spent at least $5 million and 20,000 employee hours thus far turning over the pertinent financial data to its auditors, the final restatements are not complete and the Company has not yet issued the audited financial results required by the Securities and Exchange Commission (the "SEC") and the stock exchanges.

2.      Earnings restatements such as the Company's, which have become all too frequent in the post-*Enron* era, cause severe, irreparable injury and damage to a company's reputation and goodwill in the investment and business communities and threaten to destroy this once valuable franchise. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled

2

securities analysts and the investing public, such that AFC's ability to raise capital –
on favorable terms – will be impaired in the future. This "discount" already has, and
is expected to continue to have, a destructive effect on AFC's ability to operate and to
enter into any beneficial franchise transactions, including, but not limited to, causing
the Company to:

- have its common stock delisted from NASDAQ, severely reducing its ability to use its common stock as acquisition currency;

- have its debt ratings lowered;

- be forced to seek numerous extensions on its credit facility agreement because of its inability to provide audited financial statements, resulting in: (a) AFC's creditors raising the interest rate on the Company's debt; (b) the Company's revolving line of credit being reduced; and (c) the forced prepayment of up to $64 million of the Company's term loans;

- incur $19 to $20 million in non-recurring expenses and to expend at least 20,000 hours of employee time in 2003 relating to the ongoing re-audit of its financial statements issued in FY 2000-2002, defending shareholder litigation;

- be forced to suspend its domestic franchising of its various brands, including Popeyes Chicken & Biscuits, Church's Chicken and Cinnabon, until it completes the restatement and issues accurate audited financial results for FY 2000-2002;

- use approximately $64 million from the proceeds of the sale of the Company's franchise, Seattle Coffee Co., to pay term loan indebtedness;

- be exposed to hundreds of millions of dollars in potential liability for violations of federal and state law, including federal and state securities

3

laws, which will cost the Company millions to defend and hundreds of millions more to settle; and

· suffer severe and irreparable damage to AFC's credibility, reputation and goodwill.

Plaintiffs, AFC shareholders, bring this action derivatively on behalf of AFC to seek recovery for these and other damages as will be proved at trial against its faithless fiduciaries.

II.

SUMMARY OF THE ACTION

3.    AFC operates, develops and franchises quick-service restaurants, bakeries and cafes, primarily under the trade names Popeyes Chicken & Biscuits, Church's Chicken, Cinnabon, Seattle's Best Coffee (in Hawaii, on military bases and internationally) and Torrefazione Italia. Collectively, AFC compromises over 4,000 restaurants in 47 states, the District of Columbia, Puerto Rico and 3 foreign countries. According to the Company's website, AFC had system-wide sales of approximately $2.7 billion in 2002.

4.    AFC is organized under the laws of Minnesota and headquartered in Atlanta, Georgia.  The Company was founded by Chairman and Chief Executive Officer ("CEO") Frank J. Belatti ("Belatti") in 1992 as "America's Favorite Chicken

4

Company" and officially changed its name to AFC Enterprises, Inc. in 1996 when it received substantial investments from Freeman Spogli & Co. ("Freeman Spogli"), a Los Angeles-based merchant-banking firm, and Penman Private Equity and Mezzanine Fund, LP ("Penman"), a Chicago investment firm. AFC acquired Seattle Coffee Company, Seattle's Best Coffee, and Torrefazione Italia Coffee brands in March 1998 and Cinnabon International, Inc. in October 1998. Freeman Spogli and Penman were paid $1 million in connection with the acquisition of Cinnabon.

5.     In May 1997, the still privately-held Company privately placed $175 million of Senior Subordinated Notes pursuant to an exemption under Rule 144A of the Securities Act of 1933, as amended, which were then registered with the SEC in August of 1997, making them publicly tradable. Though the Company's equity continued to be privately-held, the existence of its publicly-traded debt required it to register and make periodic financial reports under the Securities and Exchange Act of 1934. At the direction of director defendants Belatti, John M. Roth ("Roth"), Ronald P. Spogli ("Spogli"), and Kelvin J. Pennington ("Pennington"), between FY 1997 and FY 2001, the Company reported (virtually) quarter after quarter of increasing revenues, earnings and assets:

5

| Period | Revenues | Earnings | Assets |
|---|---|---|---|
| Q ending 6/15/97 | $112 M | $6.4 million | $395 M |
| Q ending 9/7/97 | $108.5 M | $658,000 | $380 M |
| *FY ending 12/28/97* | *$483 M* | *$11 M* | *$331 M* |
| Q ending 3/22/98 | $114 M | $73,000 | $487 M |
| Q ending 6/14/98 | $139 M | $231 M | $486 M |
| Q ending 9/6/98 | $142 M | $1.7 M | $488 M |
| *FY ending 12/27/98* | *$609 M* | *$8.65 M* | *$556 M* |
| Q ending 3/21/99 | $158 M | $592,000 | $552 M |
| Q ending 6/13/99 | $164 M | $3.9 M | $557 M |
| Q ending 9/5/99 | $164 M | $3.2 M | $552 M |

| *FY ending* *12/26/99* | *$707 M* | *$12 M* | *$562 M* |
|---|---|---|---|
| Q ending 4/16/00 | $220.3 M | $5.1 M | $551 M |
| Q ending 7/9/00 | $163.3 M | $5.7 M | $538 M |
| Q ending 10/1/00 | $163 M | $7.4 M | $536 M |
| *FY ending* *12/31/00* | *$598 M* | *$27.4 M* | *$539 M* |

6.      Meanwhile, defendants had caused AFC to amass a daunting debt-load, which, including its so-called "acquisition facility," had reached $366 million by December 31, 2000.

7.      Between 1996 and 1999, defendants caused the Company to issue themselves, Freeman Spogli and Penman millions of shares of Company common stock.  Defendants also caused AFC to provide millions of dollars in long-term "loans" to them to pay the purchase price and/or their stock option exercise prices, which were only collateralized by the stock issued.  As a result of these stock issuances, by December 2000, Freeman Spogli held 14 million shares of AFC

7

common stock, or 47.3%, Penman held 1.6 million shares, or 5.3%, and Belatti held another 2.2 million shares, or 7.1%. But none of this stock was publicly tradable. These loans allowed defendants to purchase Company stock at approximately $11 per share or lower and also contained provisions allowing defendants to repay the loans with Company stock in an initial public stock offering. Seeking to create a public market to sell their Company stock in and to relieve themselves of these "loans," defendants conspired to cause the Company to conduct an underwritten public stock offering.

8.    On December 22, 2000, defendants filed a Form S-1 Registration Statement with the SEC, initially indicating the Company would offer no more than $100 million worth of stock. By the time the Company's amended Registration Statement was declared effective in March 1, 2001, the Company was issuing in excess of 10 million shares for over $183 million in proceeds. On March 2, 2001, the Company sold 3,136,328 shares of its common stock at a price of $17.00 per share and received approximately $47.3 million net cash proceeds after deducting underwriting commission, offering expenses, and other associated miscellaneous costs. These net proceeds were used to repay a portion of the Company's acquisition facility. In the same offering, defendants caused the Company to register another

8

6,250,000 shares of its common stock to be sold by Company insiders and venture capital financiers.

9.    The Registration Statement was declared effective in February 2001 and reiterated and incorporated by reference the Company's previously reported financial results for FY 1998 - 2000. The Registration Statement was signed by defendants Belatti, Chief Financial Officer ("CFO") Gerald J. Wilkins ("Wilkins"), director and President Dick R. Holbrook ("Holbrook"), director Matt L. Figel ("Figel"), director (and Penman principal) Pennington, director (and Freeman Spogli principal) Roth, director (and principal of Freeman Spogli) Spogli and director Peter Starrett ("Starrett").

10.    Thereafter, defendants caused AFC to report three more quarters of false, but purportedly stellar financial performance:

| Period | Revenues | Earnings | Assets |
| --- | --- | --- | --- |
| Q ending 4/22/01 | $211 M | $8 M | $539 M |
| Q ending 7/15/01 | $162 M | $8.7 M | $539 M |
| Q ending 10/7/01 | $158 M | $8.4 M | $537 M |

11.     Then again in November of 2001, defendants caused the Company to file a second Form S-1 Registration Statement, this time registering an additional 7 million shares to be sold at $23 dollars per share, but this time only by Company insiders and financiers. Freeman Spogli, for which defendant Spogli was a principal, sold 5.76 million shares for $132.5 million in proceeds, reducing its holdings to 8.3 million shares, or 27.6%. Penman, of which director Pennington was a principal, sold another 650,000 shares for proceeds of $15 million, reducing its holdings to under 1 million shares, or 3.1%. Officers and directors Belatti, Holbrook and Samuel N. Frankel sold another 300,000, 150,000 and 150,000 shares, respectively, for $7 million, $3.5 million and $3.5 million in proceeds. Once, again, the Registration Statement declared effective in December 2001, reiterated and incorporated by reference the Company's previously reported financial results for FY 1998 - 2000 and for the period ending October 7, 2001. The Registration Statement was again signed by defendants Belatti, Wilkins, Holbrook, director Victor Arias, Jr. ("Arias"), director Carolyn Hogan Byrd ("Byrd"), Figel, director R. William Ide, III ("Ide"), Pennington, Roth, Spogli and Starrett.

12.     Thereafter, defendants caused AFC to report its last four quarters of declining, but still false, financial results:

10

| Period | Revenues | Earnings | Assets |
|--------|----------|----------|--------|
| *FY ending 12/30/01* | *$693 M* | *$36.8 M* | *$523 M* |
| Q ending 4/21/02 | $195 M | $4.4 M | $506 M |
| Q ending 7/14/02 | $150 M | $7 M | $517 M |
| Q ending 10/6/02 | $136 M | $10.6 M | $494 M |

13.     Throughout the duration of the Relevant Period, AFC's stock traded at artificially inflated levels based on these false financial results.  Certain defendants and Company insiders took further advantage, ***disposing of millions of shares of AFC stock during the Relevant Period at prices as high as $34 per share, illegally and in breach of their fiduciary duties, reaping profits of hundreds of millions of dollars.***  Additionally, on November 26, 2002, AFC said it purchased approximately 839,000 shares of AFC stock held by Penman for $21.65 per share, or $18.1 million in proceeds.

14.     Suddenly, on March 24, 2003 after the close of trading, in connection with the release of its FY 2002 financial results, AFC shocked the investment

community by disclosing that the Company's previously issued financial statements could no longer be relied upon and would have to be restated for 2001 and for the first three quarters of 2002, and that the Company expected to miss the March 31, 2003 deadline for filing its 2002 Annual Report. The Company also revealed that the restatement might include FY 2000 as well. Apparently the Company's new auditors, KPMG, LLP ("KPMG"), hired after its old auditors, Arthur Andersen LLP ("Arthur Andersen"), ceased to exist, refused to continue the charade of the Company's accounting fraud.

15.     Based on this news, on March 25, 2003, AFC's stock lost over 21% of its market value on enormous trading volumes of over 9 million shares, dropping $3.70 to close at $13.40, a 52 week low.  As a result, between March 25, 2003 and April 1, 2003 the Company's market value fell from $526.3 million to $400.1 million, erasing $126.2 million worth of market capitalization. On April 22, 2003 the Company announced it would in fact also be restating financial statements for 2000.

16.     In essence, the Company is restating its entire financial history as a publicly-held corporation.  As confirmed by defendants' statements that they will "restate," rather than merely correct, previously reported financial results, at all times during the Relevant Period the defendants caused the Company to issue false and

12

misleading financial statements and press releases concerning AFC's financial results, which were materially false when issued based on facts then known or knowable by them. The financial statements of the Company made during the Relevant Period, all of which implicitly and/or expressly were prepared in conformity with Generally Accepted Accounting Principals ("GAAP"), were materially false and misleading because defendants caused the Company to materially overstate its earnings during the Relevant Period, which also had the effect of overstating assets.

17.   Throughout the Relevant Period, defendants, with the assistance of Arthur Andersen, caused AFC to materially overstate its earnings and assets by improperly booking franchise sales proceeds as revenues and failing to accurately reflect the impaired value of certain assets on its books. Along with the restatements, AFC's new accountants will require the Company to change how it records the sale of company-owned stores to franchisees to comply with the accounting rules and regulations. Instead of recording all of the sales proceeds as an immediate gain, the Company should have in the past and must in the future defer a portion of the income, especially in cases where it continues to lease the property to the franchisee. AFC has speculated it expects to reduce previously reported earnings by at least $6.3 million to $7 million pre-tax at year-end 2001 and at least $4 million to $4.5 million pre-tax for

13

the first three quarters of FY 2002 to defer gains previously improperly recognized on sales of assets to franchisees. The deferred gains will be recognized in future periods as conditions required under the accounting rules to recognize such gains are satisfied. Each of the defendants, especially the executive directors and members of the Audit Committee, were readily familiar with and acquiesced in this accounting treatment. The Company has not yet disclosed how much it will restate FY 2000's earnings, but it has disclosed that its restatement will also change the way it records and reports long-lived asset impairments.

18.    As of the filing of this Consolidated Amended Complaint, the Company has yet to issue its restated financial statements for FY 2000, 2001, 2002, and interim periods. As a result, the Company's stock has been delisted by NASDAQ and is now quoted only on the National Quotation Service Bureau (the "Pink Sheets") for unsolicited trading under the symbol "afce.pk." Moreover, so the Company would not be in violation of its financial covenants with its lenders, it was forced to seek numerous amendments to its credit facility agreements with its lenders for additional time to complete its 2002 "year end" audit process and submit its financial statements and related reports such as the annual budget and excess flow calculation and certification. These numerous amendments have resulted in AFC's creditors raising

14

the interest rates of their loans and reducing the Company's lines of credit, and the Company has had to use nearly all of the proceeds of the sale of the Company's franchise, Seattle Coffee Co., to pay term loan indebtedness- money the Company could otherwise have been using for business purposes.

19.     As a direct result of this illegal course of conduct, the Company is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the Northern District of Georgia, Atlanta Division, on behalf of investors who purchased AFC shares. These lawsuits allege that investors purchased shares of the Company's common stock based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby. Specifically, those actions allege that defendants caused AFC to: (i) materially overstate its operating results by failing to properly account for operating results; (ii) deceived the investing public regarding AFC's business, its finances and intrinsic value of AFC common stock; (iii) issue false and misleading financial statements; and as a result of the foregoing, caused investors to purchase AFC common stock at artificially inflated prices. In addition, the Company is subject to another class action suit asserting strict liability and brought on behalf of all AFC stockholders who purchased the common stock of the Company

15

traceable to the Registration Statements. The suit alleges that the defendants, including the Company, violated the Securities Act of 1933 by issuing a Registration Statement and Prospectus in connection with the offering of the securities which contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading.

20. In addition, as a result of defendants' illegal actions, the Company's goodwill and reputation have also been severely damaged, which will make it difficult if not impossible to raise money needed to fund AFC going forward. The Company's debt ratings have been cut and it has been downgraded by numerous stock analysts who have attacked the Company's credibility and that of its senior management. *Further, the defendants caused the Company to admit it lacked adequate internal controls and accounting procedures and that AFC's accounting and financial reporting functions were deficient throughout the Relevant Period.*

21. The Individual Defendants named herein (as defined in ¶¶28-41), who are directors and/or officers of AFC, participated in this conspiracy to obtain the financial and social benefits of such positions for themselves, to enrich and further the personal and business interests of all defendants identified herein, and to allow all the Individual Defendants to maintain their positions of control at AFC so that they would

not be sued for their wrongdoing. The directors who did not sell stock during the Relevant Period participated by approving of AFC's false financial reporting and facilitating the other defendants' insider trading and are unwilling to sue to recover the insider trading proceeds from their fellow board members with whom they have extensive business, financial and personal relationships with as alleged herein at ¶¶28-37.

22.    This Board is a prime example of a conflicted Board which is hopelessly unable to govern, and the resulting harm to AFC could not be more obvious. For instance, of the ten-member Board, two members (Belatti and Holbrook) are insider executives, both of whom have been with the Company long-term and both of whom sold stock at artificially inflated prices. Six of the ten Board members (Belatti, Pennington, Roth, Spogli, Starrett and Holbrook) sold stock at inflated prices during the Relevant Period. Four of the Board members (Roth, Spogli, Starrett and Figel) are affiliated with Freeman Spogli and a fifth (Pennington) is with Penman, both of which are investment funds that own -- or did own -- substantial AFC stock that was sold at inflated prices during the Relevant Period. Defendants tacitly conceded the Board's lack of independence in its 2002 Annual Proxy Statement to Shareholders where they admit that only directors "who [were] not a member of our Board before our initial

17

public offering and [are] not an employee of AFC, which includes Victor Arias, Jr.,

Carolyn Hogan Byrd and R. William Ide, III, receive" any directors' fees at all.  The

three members of AFC's Audit Committee (Byrd, Figel and Pennington) enlisted the

services of Arthur Andersen to serve as the Company's so-called "independent"

auditor in 2001, despite the fact that they were causing the Company to pay Arthur

Andersen over $1 million for non-audit services, including assisting with the stock

offerings, as compared to the paltry $315,000 auditing fee Arthur Andersen received,

which as demonstrated by the *Enron* fiasco creates perverse disincentives for the

auditors to stand up to management.  As a result of defendants' wrongful acts and the

conflicted Board's failure to oversee and prevent this misconduct, the Company has

suffered severe and irreparable damage to its reputation, goodwill and its ability to

conduct future operations.

III.

JURISDICTION AND VENUE

23.    This Court has jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a)(2) (2002) in that plaintiffs and defendants are citizens of different states and

the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court

also has jurisdiction over this action pursuant to 28 U.S.C. §1331 (2002) and

18

supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) (2002).

24.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

25.     Venue is proper in the Court because nominal defendant AFC is headquartered in this district and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

IV.

PARTIES

26.     Plaintiff Wesley Fortenberry, a resident of the State of Alabama, is and was at all relevant times complained of herein, a shareholder of nominal defendant AFC. Plaintiff Richard Charles Guarneri, a resident of the State of South Carolina, is and was at all relevant times complained of herein, a shareholder of nominal defendant AFC.

19

27.     Nominal defendant AFC is a Minnesota corporation with its principal executive offices located at Six Concourse Parkway, Suite 1700, Atlanta, GA 30328.

28.     Defendant Belatti was, at all relevant times, Chairman of the Board of AFC, its CEO, and is currently its interim Chief Financial Officer ("CFO") and a member of its Executive (Chair) and Strategic Development Committees. Belatti is a citizen of Georgia. As a director of AFC, Belatti owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as its CEO and a member of AFC's Executive and Strategic Development Committees, Belatti had also assumed important managerial responsibilities at AFC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Belatti owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Belatti also serves on the board of directors of Galyan's Trading Company, Inc., along with director defendants Roth, Spogli and Starrett. In 1996, Belatti oversaw the sale of a major stake in AFC to Freeman Spogli.

20

Two of the principals of Freeman Spogli, defendants Roth and Spogli, joined the AFC board that same year and continue to serve as directors. Freeman Spogli is AFC's largest shareholder, as identified in the Company's 2002 Proxy Statement, now owning less than 25% of the Company's stock after its massive Relevant Period stock sales. During the Relevant Period, Belatti engaged in extensive insider trading himself, disposing of a total of 438,000 shares for proceeds of over $10.6 million, some of which were sold in the Company's December 2002 underwritten secondary offering. In addition to his base salary of approximately $560,000 per year from 2000 through 2002, Belatti received the following incentive bonuses and stock options based on the Company's materially overstated financial performance:

| Year | Bonus | Number of Stock Options |
|------|-------|-------------------------|
| 2000 | $432,500 | 33,333 |
| 2001 | $382,812 | 60,000 |

Belatti also signed the materially false and misleading Registration Statements in 2001 and the Company's Annual Financial Reports throughout the Relevant Period and made numerous public appearances at investor conferences and roadshows to facilitate the Company's initial and secondary public stock offerings which allowed him and the other defendants to sell millions of dollars worth of their own AFC stock at prices

21

artificially inflated by the Company's false and misleading financial statements.

29.     Defendant Pennington was, at all relevant times, a director of AFC and a member of its Audit and Compensation Committees. Pennington is also a principal of Penman, which was a controlling shareholder of AFC during the Relevant Period before its own significant stock sales in the December 2002 secondary offering. Pennington is a citizen of Illinois. As a director of AFC, Pennington owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Audit and Compensation Committees, Pennington had also assumed important managerial responsibilities at AFC which required him to be well informed about the day-to-day operations of the Company, particularly, as a member of the Audit Committee, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Pennington owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the

22

Relevant Period, Pennington and Penman engaged in massive insider trading disposing of at least 1.57 million shares for proceeds exceeding \$35 million. Pennington also signed the materially false and misleading Registration Statements in 2001 and the Company's Annual Financial Reports throughout the Relevant Period to facilitate the Company's initial and secondary public stock offerings which allowed him and the other defendants to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

30.    Defendant Roth was, at all relevant times, a director of AFC and a member of its Executive and Compensation Committees. Roth is also a principal of Freeman Spogli, the Company's controlling shareholder which sold a significant amount of stock in the 2002 secondary offering. Roth is a citizen of Connecticut. As a director of AFC, Roth owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Executive and Compensation Committees, Roth had also assumed important managerial responsibilities at AFC that required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Roth owed to AFC and its shareholders he, upon information and

23

belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Roth also serves on the board of directors of Galyan's Trading Company, Inc. along with defendant directors Belatti, Spogli and Starrett. Roth also serves on the board of directors of Advance Auto Parts, Inc. along with director defendant Spogli. During the Relevant Period, Roth, along with defendant Spogli and Freeman Spogli, engaged in massive insider trading selling in excess of 6.6 million shares of AFC stock for proceeds exceeding $145 million. Roth also signed the materially false and misleading Registration Statements in 2001 and the Company's Annual Financial Reports throughout the Relevant Period to facilitate the Company's initial and secondary public stock offerings which allowed him and the other defendants to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

31.    Defendant Spogli was, at all relevant times, a director of AFC and a member of its Executive Committee. Spogli is a founding principal of Freeman Spogli, the Company's controlling shareholder that sold a significant amount of stock

24

in the Company's December 2002 secondary offering.   Spogli is a citizen of California.   As a director of AFC, Spogli owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.   Moreover, as a member of its Executive Committee, Spogli had also assumed important managerial responsibilities at AFC that required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Spogli owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.   Spogli also serves on the board of directors of Galyan's Trading Company, Inc. along with defendant directors Belatti, Roth and Starrett.   Spogli also serves on the board of directors of Advance Auto Parts, Inc. along with director defendant Roth.   During the Relevant Period, Spogli, along with defendant Roth and Freeman Spogli, engaged in massive insider trading by selling over 6.6 million shares of AFC stock for proceeds exceeding $145 million.   Spogli also signed the materially false and misleading Registration Statements in 2001 and the Company's Annual Financial Reports throughout the

25

Relevant Period to facilitate the Company's initial and secondary public stock offerings which allowed him and the other defendants to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

32. Defendant Starrett was, at all relevant times, a director of AFC. Starrett is a citizen of California. As a director of AFC, Starrett owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Rather than fulfill these important fiduciary duties Starrett owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Starrett also serves on the board of directors of Galyan's Trading Company, Inc. along with defendant directors Belatti, Roth and Spogli. Starrett is also an affiliated operating executive of Freeman Spogli. During the Relevant Period, Starrett engaged in personal insider trading disposing of 15,000 shares for proceeds of $453,995 and assisted Roth, Spogli and Freeman Spogli in their sales. Starrett also signed the materially false and misleading Registration Statements

26

in 2001 and the Company's Annual Financial Reports throughout the Relevant Period to facilitate the Company's initial and secondary public stock offerings which allowed him and the other defendants to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

33.    Defendant Byrd was, at all relevant times, a director of AFC and Chair of its Audit Committee during the Relevant Period.  Byrd is a citizen of Georgia.  As a director of AFC, Byrd owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member and Chair of its Audit Committee, Byrd had also assumed important managerial responsibilities at AFC which required her to be well informed about the day-to-day operations of the Company, particularly with respect to the Company's internal systems of accounting controls and procedures and ensuring the Company's financial statements complied with GAAP.    Rather than fulfill these important fiduciary duties Byrd owed to AFC and its shareholders she, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached her fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently

27

disregarding these wrongful acts or omissions. Byrd also serves on the board of directors of Rare Hospitality International, Inc. along with defendant Holbrook, AFC's president. From 1977 until September 2000, Byrd served as Chief of Internal Audits, Director of the Corporate Auditing Department and, most recently, as President of Coca-Cola Financial Corporation and Vice President of The Coca-Cola Company, and certain of AFC's franchises distribute Coca-Cola. Byrd was appointed as an AFC director by defendants Belatti, Roth, Spogli and Pennington in May 2001 in connection with the Company's initial stock offering. Byrd also signed the materially false and misleading Registration Statements in 2001 and the Company's Annual Financial Reports throughout the Relevant Period to facilitate the Company's initial and secondary public stock offerings which allowed certain defendants, including Belatti, Holbrook, Roth, Spogli and Pennington, with whom Byrd has extensive business, financial and social relationships, to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

34.     Defendant Arias was, at all relevant times, a director of AFC and a member and Chair of its Compensation Committee during the Relevant Period. Arias is a citizen of Texas. As a director of AFC, Arias owed a duty to the Company and its

shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member and Chair of its Compensation Committee, Arias had also assumed important managerial responsibilities at AFC that required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Arias owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Arias was appointed as an AFC director by defendants Belatti, Roth, Spogli and Pennington in May 2001 in connection with the Company's initial stock offering and cannot act independently of them. Arias also signed a materially false and misleading Registration Statement in 2001 and the Company's Annual Financial Reports throughout the Relevant Period to facilitate the Company's initial and secondary public stock offerings which allowed certain defendants to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

29

35.    Defendant Figel was, at all relevant times, a director of AFC and a member of its Audit Committee.  Figel is a citizen of California.  As a director of AFC, Figel owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member of its Audit Committee, Figel had also assumed important managerial responsibilities at AFC which required him to be well informed about the day-to-day operations of the Company, particularly with respect to the Company's internal systems of accounting controls and procedures and ensuring the Company's financial statements complied with GAAP.  Rather than fulfill these important fiduciary duties Figel owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  From October 1986 to December 1996, Figel was also employed by Freeman Spogli, and as such has extensive business, financial and personal relationships with Belatti, Roth, Spogli and Starrett and cannot act independently of them.  Figel also signed the materially false and misleading Registration Statements in 2001 and the Company's Annual Financial Reports

30

throughout the Relevant Period to facilitate the Company's initial and secondary public stock offerings which allowed certain defendants, including defendants Belatti, Roth, Spogli and Freeman Spogli, to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

36.    Defendant Ide was, at all relevant times, a director of AFC and a member and Chair of its Strategic Development Committee during the Relevant Period. Ide is a citizen of Georgia. As a director of AFC, Ide owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.    Moreover, as a member and Chair of its Strategic Development Committee, Ide had also assumed important managerial responsibilities at AFC that required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Ide owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Ide was appointed by defendants Belatti, Roth, Spogli and Pennington

31

after the Company's initial public stock offering. Ide signed a materially false and misleading Registration Statement in 2001 and the Company's Annual Financial Report in 2002 which facilitated the Company's secondary public stock offerings and allowed certain defendants to sell millions of dollars worth of their own AFC stock at prices artificially inflated by the Company's false and misleading financial statements.

37. Defendant Holbrook was, at all relevant times, a director of AFC, its President, Chief Operating Officer ("COO"), and a member of its Strategic Development Committee. Holbrook is a citizen of Georgia. As a director of AFC, Holbrook owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as President, COO and a member of its Strategic Development Committee, Holbrook had also assumed important managerial responsibilities at AFC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Holbrook owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Holbrook also serves on the board of

32

directors of Rare Hospitality International, Inc. along with defendant director Byrd. During the Relevant Period, Holbrook engaged in massive insider trading disposing of 260,500 shares for proceeds of in excess of $6.3 million. In addition to his base salary of approximately $408,000 per year from 2000 through 2002, Holbrook received the following bonuses and stock options based on the Company's materially overstated financial performance:

| Year | Bonus | Number of Stock Options |
|------|-------|-------------------------|
| 2000 | $245,000 | 26,666 |
| 2001 | $285,812 | 46,666 |

38.     Defendant Wilkins was, at all relevant times, prior to his resignation on or about April 29, 2003, a director of AFC, its CFO and Executive Vice President. Wilkins is a citizen of Georgia. As a director of AFC, Wilkins owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CFO and Executive Vice President, Wilkins had also assumed important managerial responsibilities at AFC which required him to be well informed about the day-to-day operations of the Company, particularly, as CFO, with respect to the Company's internal systems of accounting controls and procedures and ensuring the Company's financial statements complied

33

with GAAP. Rather than fulfill these important fiduciary duties Wilkins owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Wilkins engaged in massive insider trading, disposing of 40,000 shares on January 23, 2002 for proceeds of over $1.1 million through the exercise of options, and disposing of another 30,000 shares on March 11, 2002 through the exercise of options at prices as high as $34 per share, for additional proceeds of almost $1 million. In addition to his base salary of approximately $342,000 per year from 2000 through 2002, Wilkins received the following bonuses and stock options based on the Company's materially overstated financial performance:

| Year | Bonus | Number of Stock Options |
|------|-------|-------------------------|
| 2000 | $200,000 | 20,000 |
| 2001 | $362,359 | 40,531 |

39.     Defendant Hala G. Moddelmog ("Moddelmog") was, at all relevant times, an officer of AFC and President of Church's Chicken, a division of the

34

Company. Moddelmog is a citizen of Georgia. As an officer of AFC, Moddelmog owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as President of Church's Chicken, Moddelmog had also assumed important managerial responsibilities at AFC that required her to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Moddelmog owed to AFC and its shareholders she, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached her fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Moddelmog engaged in massive insider trading, disposing of approximately 103,115 shares for proceeds of over $2.6 million. In addition to her base salary of approximately $330,000 per year from 2000 through 2002, Moddelmog received the following bonuses and stock options based on the Company's materially overstated financial performance:

| Year | Bonus | Number of Stock Options |
|------|-----------|-------------------------|
| 2000 | $100,000 | 16,666 |
| 2001 | $113,156 | 30,000 |

40.    Defendant Jon Luther ("Luther") was, at all relevant times prior to his resignation on or about December 10, 2002, an officer of AFC and President of Popeyes Chicken & Biscuits, a division of the Company. Luther is a citizen of Georgia.    As an officer of AFC, Luther owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as President of Popeyes Chicken & Biscuits, Luther had also assumed important managerial responsibilities at AFC that required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Luther owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.    During the Relevant Period, Luther engaged in massive insider trading, disposing of approximately 61,000 shares for proceeds of over $1.6 million. In addition to his base salary of approximately $332,000 per year from 2000 through 2002, Luther received the following bonuses and stock options based on the Company's materially overstated financial performance:

36

| Year | Bonus | Number of Stock Options |
|------|-------|------------------------|
| 2000 | $175,000 | 13,333 |
| 2001 | $271,857 | 33,333 |

41.    Defendant Gregg A. Kaplan ("Kaplan") was, at all relevant times prior to his resignation on or about June 26, 2002, an officer of AFC and President of Cinnabon, a division of the Company. Kaplan is a citizen of Georgia. As an officer of AFC, Kaplan owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, Kaplan had also assumed important managerial responsibilities at AFC that required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Kaplan owed to AFC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of AFC by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Kaplan engaged in insider trading, disposing of approximately 22,700 shares for proceeds of over $646 million. Upon information and belief, Kaplan also received a lucrative salary, bonuses and stock options during the Relevant

Period until his resignation on or about June 26, 2002.

42.    Defendant Freeman Spogli is a privately owned investment firm located at 11100 Santa Monica Boulevard, Suite 1900, Los Angeles, California 90025. Defendants Roth and Spogli are principals of Freeman Spogli and defendant Starrett is an affiliated operating executive of Freeman Spogli.  In addition, from October 1986 to December 1996, defendant Figel was employed by Freeman Spogli.  Through its various limited and/or general partners, Freeman Spogli is AFC's largest shareholder, as identified in the Company's 2002 Proxy Statement, owning 24.4% of the Company's stock, making it a controlling shareholder.  During the Relevant Period, Freeman Spogli, while in possession of material, adverse, non-public information concerning AFC, disposed of millions of dollars worth of AFC stock through its various limited or general partners. Freeman Spogli also invests in other companies in which AFC directors, including Roth and Spogli themselves, sit on the boards including Galyan's Trading Company (Belatti, Roth, Spogli and Starrett directors); Advance Auto Parts (Roth and Spogli directors); Asbury Automotive (Roth director); Hudson Respiratory Care, Inc. (Spogli director); and The Pantry, Inc. (Starrett director).

38

43.    Defendants Penman and Penman Asset Management L.P., its General Partner (collectively, "Penman") are a privately owned investment firm located at 30 North LaSalle Street, Suite 1620, Chicago, Illinois 60602.  Defendant Pennington is the General Partner of Penman Asset Management L.P.  Through its various limited and/or general partners, Penman was a controlling shareholder of AFC during the Relevant Period.  During the Relevant Period, Penman, while in possession of material, adverse, non-public information concerning AFC, disposed of millions of dollars worth of AFC stock.  Penman sold $15 million worth of stock in the Company's December 2002 secondary offering.  Then, on November 24, 2002, defendants reported they caused AFC to purchase an additional 839,000 shares of AFC stock from Penman for $21.65 per share, or $18.1 million in proceeds, just months before the Company disclosed that it would have to restate all of the earnings it reported during its entire life as a publicly-held company.

44.    The Defendants identified above in ¶¶28-41 are collectively referred to hereinafter as the "Individual Defendants."  For demand futility purposes, the Defendants identified in ¶¶28-37, who make up the current Board of AFC, are referred to as the "Current Director Defendants."  The Defendants identified in ¶¶28-32, 38-43 are referred to as the "Insider Selling Defendants."

V.

## FACTUAL ALLEGATIONS

45.    AFC operates, develops and franchises quick-service restaurants, bakeries and cafes, primarily under the trade names Popeyes Chicken & Biscuits, Church's Chicken, Cinnabon, Seattle's Best Coffee and Torrefazione Italia. Collectively, AFC comprises over 4,000 restaurants in 47 states, the District of Columbia, Puerto Rico and 3 foreign countries.

46.    On March 24, 2003, after the close of the market, the Individual Defendants caused the Company to issue a press release entitled "AFC Enterprises to Restate Earnings for 2001 and First Three Quarters of 2002" which stated in relevant part:

> [AFC] will restate earnings for 2001 and the first three quarters of 2002. The restatement announced today results from a detailed review of the Company's financial accounting and reporting that was precipitated by the adjustments that the Company reported in the third quarter of 2002 and those identified in the Company's closing process for 2002. Working with the Company's new auditors KPMG LLP, management has re-evaluated many of its accounting policies and applications of generally accepted accounting principles. This process has resulted in a number of adjustments that will be reflected in this restatement.

47.    The Company also revealed that the restatement might include FY 2000 as well. On March 25, 2003, AFC stock lost over 21% of its value on enormous

40

trading volumes of over 9 million shares, dropping $3.70 to close at $13.40, a 52 week low.  Furthermore, as a result of the restatement announcement, between March 25, 2003 and April 1, 2003, the Company's market value fell from $526.3 million to $400.1 million, erasing $126.2 million worth of market capitalization.

48.    As a result of the Company's shocking announcement of the restatement, numerous analysts attacked the credibility of the Company and its management.  For example, Salomon Smith Barney analyst Mark Kalinowski called the restatement announcement a "bombshell" in a report to investors and withdrew his 2003 earnings and target price until the restatements are clarified.  Similarly, Richard Glass, a Morgan Stanley Investment Manager, voiced shock concerning the news during a March 24, 2003 conference call stating: *"[t]here has to be some accountability in the company and changes need to be made if management is at all...interested in regaining any credibility in the financial community.  Because right now it's got to be zero - or below zero."*

49.    The Company lost such credibility with analysts that they pulled their Earnings Per Share ("EPS") estimates for AFC and refused to give forward guidance of the Company's projected earnings.  For example, a report by CIBC World Markets, Inc. on April 3, 2003 entitled "AFC Enterprises, Inc: 1Q03 Business Update

41

Disappoints" concluded:

> *"Given the scope of uncertainty around historical earnings, it is at this point impossible to have accurate prospective earnings estimates and therefore we will continue to withhold our estimates pending a final outcome of the '01 and '02 audits. We maintain our Sector Underperformer rating as we believe it will take a considerable amount of time before the company rebuilds shareholder credibility."*

50.    An article in the *Atlanta Business Chronicle* on April 7, 2003 by Walter Woods entitled "Stock sold before AFC 'bombshell,'" in discussing Penman's massive insider sales just months before the announcement of the restatement, noted that

*"Analysts described the announcement as a 'bombshell' that fried AFC's credibility on Wall Street."*

51.    A report by Citigroup on April 15, 2003 entitled "AFCE: Is AFC at Risk of Being De-Listed from NASDAQ?", discussing the possibility that AFC could receive a de-listing notice the next day for failure to timely file its FY 2002 Form 10-K, stated in relevant part:

> *"With management credibility already exceedingly low on the Street, this just adds more reason why we choose to stick with our Underperform (3H) rating on the shares..."*
>
> * * *
>
> *AFC already suffers from large credibility issues, in the Street's eyes. These stem from items such as the March 24 announcement that the company would restate full-year 2001 and Q1-Q3 2002 earnings due to accounting issues. In addition, the habit of putting out some of the company's key releases several hours after the market close (when*

42

*most investors are likely at home)...has also irritated the Street.*

52.   Indeed, on April 16, 2003 the Company was notified by The NASDAQ Stock Market, Inc. that it intended to delist the AFC's common stock from NASDAQ due to the Company's failure to timely file its Annual Report on Form 10-K for 2002. The Company was forced to seek a hearing before the NASDAQ Listing Qualifications Panel to appeal this determination and seek additional time to file the Form 10-K following completion of the restatements of its false financial statements.

53.   In addition, so that the Company would not be in violation of its financial covenants with its lenders, the Company was forced to amend its credit facility agreements with its lenders for additional time to complete its 2002 year end audit process and submit its financial statements, and related reports, such as the annual budget and excess flow calculation and certification.

54.   On April 22, 2002, the Individual Defendants caused the Company to issue a press release entitled "AFC Enterprises Announces Restatement of 2000 Earnings" which stated in relevant part:

> [AFC], today announced that it has determined that it will restate its financial statements for 2000 to reflect adjustments relating to some of the same previously announced items that resulted in the 2001 and 2002 restatements.

* * *

43

AFC determined that it should restate its 2000 statements to reflect adjustments relating to some of the same items that resulted in the 2001 and 2002 restatements. However, the Company has recently begun the process of restating its 2000 financial statements, and therefore the Company may subsequently determine that other adjustments to the 2000 financial statements may be necessary.

AFC is in the process of finalizing the adjustments described in the March 24 press release and this press release and in preparing restated financial statements that will reflect those adjustments. Accordingly, the amounts described in the March 24 press release and this press release reflect AFC's current estimates of these adjustments, and the actual adjustments to be reflected in the Company's restated financial statements could vary from those estimates. In addition, until the audits of the respective periods are completed, there can be no assurance that additional adjustments to the Company's financial statements will not be required. AFC will file its Form 10-K for fiscal year 2002 once it has completed its restatements of 2002, 2001, and 2000 and KPMG LLP has completed independent audits of those financial statements.

Nasdaq Delisting Notification

On April 16, 2003, AFC was notified by The Nasdaq Stock Market, Inc. that it intends to delist the Company's common stock from The Nasdaq National Market due to the Company's failure to timely file its Annual Report of Form 10-K for 2002. As provided under Nasdaq Stock Market rules, AFC intends to request a hearing before the Nasdaq Listing Qualifications Panel to appeal this determination and to request additional time to file the Form 10-K following completion of the restatements of its financial statements. AFC's common stock will continue to trade on The Nasdaq National Market pending the outcome of the hearing. There is no assurance that the Listing Qualifications Panel will grant the Company's request for continued listing. As a result of this notice from Nasdaq, AFC's trading symbol temporarily has been changed to "AFCEE."

44

55.     Subsequently, on April 29, 2003, the Company announced that defendant Wilkins, a director and the Company's CFO and Executive Vice President, had "resigned." The same day, Bear, Stearns & Co. Inc. ("Bear Stearns") issued an equity research report on AFC entitled "AFC Enterprises - Underperform; CFO Wilkins Resigns; Belatti to Act as Interim CFO" which stated "[w]e reiterate our Underperform rating on AFCEE shares. We think that a change in senior financial management at AFC was necessary, *but it will take some time for the company to rebuild its credibility.*"

56.     Commenting further on the effect of the restatement, Citigroup issued a report on AFC on May 9, 2003 entitled "AFCEE: Re-Estimating 2001, 2002, and 2003 EPS/Introducing 2004 EPS Forecast" that stated in relevant part: "[I]n our opinion, AFC should trade near the bottom of the range in terms of fast-food stock P/Es, owing largely to the company's struggles with its earnings restatements...Looking specifically at AFC Enterprises, several items drive our unfavorable rating. First, multiple missteps related to accounting issues -- including past earnings restatements -- could weigh on investors' opinion of AFC for quite sometime..."

45

57.   Because of the Company's continued inability to complete its audit process, the Company was forced to seek a second amendment to its credit facility agreement which was approved on May 30, 2003. The second amendment gave the Company until August 22, 2003 to complete its year-end audit process and submit its financial statements, and related reports, such as the annual budget and excess flow calculation and certification.   In addition, because of the restatements and audit process and inability to complete its 2002 financial statements, the Company announced it was temporarily suspending certain domestic franchise sales-related activities - a vital part of the Company's business.   A press release issued by the Company on June 2, 2003 entitled "AFC Enterprises Reports First Quarter 2003 Operating Results; Company Provides Update of Key Measures and Other Business Matters; Credit Facility Extension Approved" which stated in relevant part:

Commitments and Conversions

During the first quarter of 2003, AFC signed 57 new commitments for future development of franchised units globally, compared to 153 new commitments signed in the first quarter of 2002. *The decline in commitments resulted, in part, from the fact that the Company has temporarily suspended certain domestic franchise sales-related activities, including the sale of new commitments and the sale of Company-owned units to franchisees (conversions), because it has not yet finalized its 2003 franchise offering circulars or renewed its sate franchise registrations, both of which require*

46

***AFC's 2002 financial statements.***

\* \* \*

Credit Facility

On May 30, 2003, AFC's lenders approved a second amendment to the Company's credit facility agreement allowing AFC additional time to complete its year-end audit and submit its financial statements to the lenders as well as related reports such as the annual budget and excess cash flow calculation and certification. The second amendment gives the Company until August 22, 2003, to file the appropriate documents. AFC also obtained lender approval for the sale of Seattle Coffee Company.

58.     In addition, analysts continued to refuse to issue earnings estimates for AFC.  On June 3, 2003 Bear Stearns, in an equity research report entitled "AFC Enterprises - Underperform; Cash Flow Update; Focus On New Product Rollouts Continues," concluded "[w]e reiterate our Underperform rating on AFCEE shares. In the absence of audited financial statements, we offer no earnings estimates. Business remains weak, and the timing of the financial statement filings remains uncertain."

59.     Analysts also began commenting on the effect the restatement and legal issues confronting AFC were having on the Company's management and their ability to focus on AFC's core business.  For example a June 3, 2003 report by Citigroup entitled "AFCEE: Lowering 2003 ESP Estimate for [sic] by Three Cents" stated in relevant part:

47

**RESTATEMENT AND LEGAL ISSUES MAY BE HAMPERING MANAGEMENT'S ABILITY TO FOCUS ON THE CORE BUSINESS**

We continue to believe that AFC's executive management team is being inundated with tasks regarding the financial restatement and lawsuits by shareholders. In fact, Chairman and CEO Frank Belatti (who also serves for now as acting CFO) states that approximately 50% of his time is spent on such issues. In order to assist all of executive management and look ahead and focus on the core business, the company has instituted a 100-day plan. The strategy of the plan seems to highlight the steps that the organization wants to take over the next 100 days. However, until management can produce its restated financial results, we believe that operations could suffer and execution risk is high.

60.     In addition, referring to AFC as "an investment black hole," a June 3, 2003 equity report by CIBC Word Markets, Inc. entitled "AFC Enterprises, Inc.; 1Q03 SSS Results Soft as Expected" stated in relevant part:

> · **Not much to cheer about yet.** AFCEE shares have run off April lows along with quick service peers. In our view however, the fact that the company has not reported an actual earnings number since November 12, 2002 (3Q02 results) makes the name somewhat of an investment black hole. While the company announced last night that its banks have given it another extension on amending is credit facilities until Aug. 22nd, the NASDAQ has still not provided a final decision on the stock's de-listing process.
>
> · We maintain our Sector Underperform rating.

61.     Because of the Company's continuing inability to file its Annual Report for FY 2002, the Company, on June 6, 2003, announced it would not be able to file its

48

first quarter 2003 earnings results. The Individual Defendants caused the Company to

issue a press release entitled "AFC Enterprises Postpones First Quarter 2003 Earnings

Results: Company Awaits Final Completion of 2002 Financials Before Filing First

Quarter 2003" which provided in relevant part:

> [AFC] today reiterated, as previously stated in recent conference calls
> and webcasts with the investment community, that the Company will not
> file its first quarter 2003 earnings results until after the Annual Report on
> Form 10-K for fiscal year 2002 has been filed.
>
> As required, the Nasdaq Stock Market notified AFC by letter dated May
> 29, 2003 that, in addition to the 2002 Form 10-K filing delinquency with
> the Securities and Exchange Commission, the Company has failed to file
> its Form 10-Q for the quarterly period ended April 20, 2003 as was
> required to be filed by Nasdaq Marketplace Rule 4310(c)(14). The
> Nasdaq Listing Qualifications Panel will consider the failure to timely
> file the Form 10-Q for the first quarter of 2003 in rendering its decision,
> along with additional important information provided by the Company at
> the hearing held on May 16, 2003. At that time, AFC provided
> information regarding the reasons for the delay, the approach taken to
> complete the filings and the status of these efforts.
>
> In reviewing the Company's first quarter 2003 operating performance
> results on June 3, 2003, Chairman and Chief Executive Officer Frank
> Belatti stated on AFC's conference call and webcast. "Until we finalize
> the 2002 financial statements, we are really not going to be able to
> determine our results for completed periods of 2003 or issue guidance
> relating to the performance for the remainder of the year."

62.    On June 19, 2003 the Company announced that the Nasdaq Listing

Qualifications Panel had determined to continue listing the Company's common stock

49

subject to certain conditions.  A press release issued by the Company on that date

entitled "AFC Enterprises Confirms Continued Listing on Nasdaq; Time Line Set for

Filing 2002 Form 10-K and Restated Financial Statements" stated in relevant part:

> [AFC] announced today that the Nasdaq Listing Qualifications Panel has
> determined to continue listing the Company's common stock on The
> Nasdaq National Market, subject to certain specified conditions.
>
> As part of the determination, AFC must file its Annual Report on Form
> 10-K for 2002 with the Securities and Exchange Commission, as well as
> restated financial statements for the fiscal years ended December 30,
> 2001, and December 31, 2000, by July 16, 2003, file its amended
> Quarterly Report on Form 10-Q for the quarter ended October 6, 2002,
> by August 1, 2003, and file its Quarterly Report on Form 10-Q for the
> quarter ended on April 20, 2003, by August 8, 2003.  The Company
> expects to make the filings within these time frames.
>
> In addition, under the conditions of the determination, AFC must timely
> file all of its other periodic reports for the remainder of 2003.  If AFC
> fails to make any filing within the time period required by the Nasdaq
> determination, it will not be entitled to a new hearing and its common
> stock may be delisted from Nasdaq.  The fifth character "E" will
> continue to be appended to the Company's trading symbol until Nasdaq
> confirms AFC's compliance with the filing requirements in the
> determination. The Nasdaq Listing Qualifications Panel further stated in
> their notification that AFC must continue to comply with all other
> requirements for continued listing on the Nasdaq National Market.

63.     On July 14, 2003 the Company announced that it had completed the sale

of the Seattle Coffee subsidiary to Starbucks Corporation for $72 million in cash.  In

addition, because of the ongoing audit and the Company's inability to file its

50

financials, AFC was required to seek a third amendment to its credit facility agreement. On July 14, 2003 AFC's lenders approved the third amendment to the Company's credit facility agreement. However, the agreement required AFC to use at least fifty percent of the net cash proceeds from the sale of the Seattle Coffee Company for the repayment of term loan debt. In addition, under this most recent amendment, AFC was required to file its financials by August 22, 2003.

64.     On July 15, 2003 the Company announced it would not be able to meet Nasdaq's July 16, 2003 deadline for filing its financials and also that the Company's auditors, KPMG, were expanding the scope of their inquiries into AFC's financial statements. On that date, the Individual Defendants caused the Company to issue a press release entitled "AFC Enterprises Provides Update on 10-K filing; Filing Not Expected to be Completed by Nasdaq Deadline of July 16, 2003" that stated in relevant part:

> [AFC] today provided an update on the status of the ongoing restatements of its financial statements and filing of its Annual Report on Form 10-K for fiscal year 2002. On June 19, 2003, the Company announced that the Nasdaq Listing Qualifications Panel had determined to continue listing the Company's Common Stock on the Nasdaq National Market, subject to specified conditions, one of which was the filing of the Form 10-K for 2002 with the Securities and Exchange Commission by July 16, 2003. *The Company has today informed he Panel that it will not be able to meet this condition. The Company has requested that the Panel provide an additional extension to allow the*

*Company to complete the audits for the fiscal years 2002, 2001 and 2000 and to file its Annual Report.*
* * *

In its March 24, 2003 press release, the Company indicated that in addition to the adjustments specifically described in that release there would be additional adjustments to its financial statements. *The Company has determined that these other adjustments will include, among other items, non-cash adjustments to reflect corrections to purchase accounting entries made in connection with the acquisition of Cinnabon, shortening useful lives of leasehold improvements, increasing certain accrued obligations for closed sites, adjusting sales and property tax accounts and correcting entries relating to capitalizing assets.*

*In addition, during the course of reauditing the Company's financial statements, the Company, its audit committee, and KPMG LLP, its independent auditors, have enlarged the scope of their inquiries to include an analysis of quarter-end adjustments relating to reserve and accrual accounts. The audit committee is investigating these adjustments and expects to complete this process prior to the completion of the audits of the Company's financial statements.*

65.     On this news, the next day the Company's stock plummeted again nearly 15% on unusually heavy trading volume of nearly 2.4 million shares as compared to the average daily volume at that time of approximately 173,000. Moreover, on July 16, 2003, as a result of the Company's announcement of its delayed filing and expansion of the restatement by its auditors, Bear Stearns raised its risk profile on AFC.

66.     The news that AFC's auditors had expanded the scope of the audit only further damaged the Company's already tarnished credibility with analysts.   For example, a report by Bear Stearns on July 16, 2003 entitled "AFC Enterprises - Underperform; Missing Filing Deadline; More Restatement News" concluded *"[w]e maintain our Underperform rating on AFC shares. We are again suspending our earnings estimates as the expanded restatement news reduces the ability to assess a starting earnings base. The delayed filing as well as the expansion of the restatement raises the risk profile for AFC shares."*

67.     Even worse, analysts began advising shareholders to reconsider holding on to AFC shares.  For example, in further commenting on the expanded scope of the restatement, a report by Citigroup on July 16, 2003 entitled "AFCEE: We caution Investors Regarding AFC's Volatile Situation" stated in relevant part:

> We view this as a clear negative. The expanded scope relates to "an analysis of quarter-end adjustments relating to reserve and accrual accounts." AFC does not quantify an anticipated impact to past or future earnings. *In our view, shareholders would be well-advised to reconsider any holdings they may have left. Upon the potential event of an actual de-listing, the stock could very well lose a meaningful portion of its value.* We maintain our Underperform (3S) rating on the stock in the context of our Marketweight stance on the Restaurant group.

68.     On July 23, 2003 the Company announced it was having to spend additional Company funds as a result of the ongoing audit by having to hire an

independent forensic accounting firm to assist the Company's Audit Committee and independent counsel in its ongoing investigation. On that date, the Individual Defendants caused the Company to issue a press release entitled "AFC Enterprises Provides Additional Information Regarding Ongoing Audit; Statement Issued Regarding Audit Committee Investigation" that provided in relevant part:

> In response to inquiries of the Company relating to its July 15, 2003 press release, the Company confirms that the Audit Committee of the Board of Directors of AFC Enterprises, Inc. is engaged in an independent investigation into quarter-end adjustments to reserve, asset and accrual accounts on the books of the Company and certain related matters. The Audit Committee deemed it advisable to undertake the investigation after the Company's independent auditors, KPMG LLP, raised questions regarding certain quarter-end adjustments during the course of the ongoing audit of the Company's financial statements. The purpose of the ongoing investigation is to, among other things, determine whether the quarter-end adjustments were properly recorded, and if not, the reasons for the inaccuracies. *The Audit Committee has engaged an independent forensic accounting firm to assist the Audit Committee and its independent counsel in the investigation.* As disclosed in the Company's July 15, 2003 press release, the Audit Committee expects to complete its investigation prior to the completion of the audit of the Company's financial statements.

69.   In addition, on July 23, 2003, the *Dow Jones Business News* commented on the independent accounting investigation in a article entitled "AFC Enterprises Confirms Independent Accounting Investigation" that stated in relevant part:

> AFC Enterprises Inc. disclosed Wednesday that its board's audit committee is investigating adjustments to its books, which already are

being reaudited.

The fast-food company said KPMG, LLP, its outside auditors, had raised questions about "certain quarter-end adjustments during the course of the ongoing audit of the company's financial statements."

As a result, the committee hired an unnamed forensic accounting firm to help carry out what the company called an independent investigation to determine whether end-of-quarter adjustments were properly recorded "and, if not, the reasons for the inaccuracies."

Wednesday's elaboration by the Atlanta company followed a July 15 press release in which AFC said that during a reaudit of the books for the past three fiscal years the audit committee and KPMG had enlarged the scope of their inquiries to include certain reserve and accrual accounts.

As reported, the company has asked the Nasdaq Stock Market to extend a deadline for the company's filing of financial statements.

70.    A July 24, 2003 report by Bear Stearns entitled "AFC Enterprises - Underperform; Confirms Independent Audit; Hired Forensic Accounting Firm" concluded that "[w]e reiterate our Underperform rating on AFCEE shares. *The stock is not cheap enough, in our opinion, to warrant the risks associated with this audit and the timing of the financial statements filings.*"

71.    On July 28, 2003 the Company announced Nasdaq had given it until August 8, 2003 to inform them of the Audit Committee's investigation before determining whether the Company would be given an additional extension to file its financials.  On that date, the Company issued a press release entitled "AFC

55

Enterprises Provides Update on Nasdaq Listing Status; Nasdaq Listing Qualifications

Panel Will Await Report on Audit Committee Investigation" that provided in relevant

part:

> [AFC] today announced that the Nasdaq Listing Qualifications Panel has indicated that it will not make a determination regarding whether to provide the Company with additional time to complete the restatement of its financial statements and to file its late financial reports until the Panel has received a report regarding the previously announced investigation being conducted by AFC's Audit Committee.   Pending that determination by the Panel, the Company's common stock will continue to be listed on the Nasdaq National Market.

> AFC previously announced that the Audit Committee of its Board of Directors is engaged in an independent investigation into quarter-end adjustments to reserve, asset and accrual accounts on the books of the Company and certain related matters.  According to the Nasdaq Listing Qualifications Panel's letter to AFC, the Company must inform the Panel on the results of the investigation by August 8, 2003.  The Panel will then determine whether to provide the Company with an additional extension in which to file its Annual Report on Form 10-K for 2002 and its Quarterly Report on Form 10-Q for the first quarter of 2003.

72.     On July 28, 2003, Moody's placed all AFC's ratings under review for

possible downgrade.  Furthermore, a July 29, 2003 report by Bear Stearns entitled

"AFC Enterprises - Underperform; Another Deadline from NASDAQ" concluded

"[w]e maintain our Underperform rating on AFC shares. *We think events of the past*

*week signal broader and potentially more serious implications of the restatement*

*process.* We have no way to assess AFC's audit committee's willingness or ability to

meet NASDAQ's August 8th deadline."

73.   On July 31, 2003 the Company announced it was raising its projected non-recurring expenses related to audit process, shareholder litigation and charges to the amendments to the Company's credit facility agreements to $14-$15 million, an increase from $9-$10 million originally estimated. The Company also commented on the ongoing effect of its suspension on certain domestic franchising and on its third amendment to its credit facility agreement. On that date, the Company issued a press release entitled "AFC Reports Second Quarter 2003 Operating Performance Results; Company Provides Update on Key Measures and Other Business Matters" that provided in relevant part:

Commitments and Conversions

As previously stated, the Company has temporarily suspended certain domestic franchise sales-related activities, including the sale of new commitments and the sale of Company-owned units to franchisees (conversions) because it has not yet finalized its 2003 franchise offering circulars or renewed its state franchise registrations, both of which require AFC's 2002 audited financial statements. At the end of period 7 2003, AFC had a total of 2,542 outstanding commitments for future development.

*AFC anticipates proceeds from conversions in 2003 to be $5 million or less, which represents a significant reduction from the previous estimates of $20-$30 million for 2003.*

Due to the temporary suspension of domestic franchise sales-related

activities and the elimination of future North American commitments for Seattle Coffee Company, AFC now projects to sign approximately 500-550 new commitments for future development in 2003, in comparison to the 750 originally estimated.

* * *

Credit Facility

On July 14, 2003, AFC's lenders approved a third amendment to the Company's credit facility agreement. The amendment requires AFC to use at least fifty percent of the net cash proceeds from the sale of the Seattle Coffee Company for the repayment of term loan debt. It also provides AFC the ability to utilize the remaining amount of the net cash proceeds for share repurchases and/or dividend payments, based on the Company's ability to meet certain covenant requirements, or for debt repayment or other general corporate purposes. Under the terms of its recent amendment, AFC must file its financials by August 22, 2003.

* * *

Non-Recurring Expenses

*AFC is currently projecting to incur $14-$15 million of unusual expenses in 2003. This is an increase from the $9-$10 million originally estimated. These expenses relate to the productivity initiative, the extended audit process for fiscal years 2002, 2001 and 2000, shareholder litigation and charges related to the amendments to the Company's credit facility agreement.*

74.    Referring to the Company's announcement as a "bombshell" that it had significantly reduced projected income from restaurant conversions (due to the restatement and uncompleted financials), a report by Citigroup on July 31, 2003 entitled "AFCEE: Lowering 2003 EPS Estimate from $1.74 to $1.20, Target from $16

58

to $12" stated in relevant part "[t]he bombshell (as we would characterize it) in today's release was that AFC now targets $5 million or less in proceeds from restaurant conversions, substantially less than the company's prior $20-$30 million target." The report went on to comment on the continued effect the restatement and audit process was having on management's ability to focus on Company business:

> In our opinion, AFC Enterprises' sales continued to be hampered by management's continued focus on the audit process and related matters. We believe these matters continue to take up a meaningful portion of management's time, which may mean that less-than-ideal attention is being paid to running the core business. The longer AFC goes without clearing up its restatement and delisting issues, the more the company's sales and earnings may be at risk from this factor.

75.     An August 1, 2003 article in the *Dow Jones Business News* commented on AFC's decline in operational cash due to the Company having to halt domestic franchising as a result of the restatement and ongoing audit. The article entitled "AFC Enterprises Sees Drop in Cash From Operations" stated in relevant part:

> *[AFC] said that because of a hiatus on restaurant franchising activity it is projecting a 10%-15% decline in cash from operations this year.*
>
> *Franchising was put on hold pending completion of ongoing audits of the fast-food chains operator's books. Before the Atlanta company can resume franchising - a major part of its business - it must complete and file new offering circulars that include updated financial statements.*
>
> The Company also said on a conference call Friday that its debt level is likely to increase from $130 million if it receives approval to withdraw

some of that to buy back its stock.

76.    In addition, a August 1, 2003 equity research report by CIBC World Markets, Inc., entitled "AFC Enterprises, Inc.; 2Q03 Update: Comps Improve Marginally; Cash Flow Deteriorates" concluded "[w]ith the cash flow situation deteriorating and audit issues unresolved, it is difficult to recommend this stock at this point."

77.    On August 8, 2003, the Company announced it had delivered to Nasdaq a report on its investigation into certain accounting issues as required. ***However, on August 14, 2003 the Company announced that it had been notified by Nasdaq that AFC's common stock would be delisted as of the opening of business on August 18, 2003. The Company also admitted for the first time that the Company lacked adequate internal controls and accounting procedures.*** The Company issued a press release on August 14, 2003 entitled "AFC Enterprises Receives Notice Regarding Continued Listing on The Nasdaq Stock Market; Nasdaq Listing Qualifications Panel Determines That Shares Will be Delisted; Summary of Audit Committee Investigation Provided" that stated in relevant part:

> *[AFC] today announced that the Nasdaq Listing Qualifications Panel (the "Panel") has notified the Company that its common stock will be delisted from the Nasdaq National Market as of the opening of business on Monday, August 18, 2003.*

* * *

*[I]n light of the length of the ongoing delinquency in the Company's SEC filings the Panel had determined to deny the Company's request for a further exception to the filing requirements and to delist the Company's common stock.*

Following the delisting, the Company expects that its common stock will continue to be quoted on the National Quotation Service Bureau (the "Pink Sheets") for unsolicited trading. However, the Company's common stock will not be eligible for quotation on the OTC Bulletin Board because it will not have publicly available financial statements that would be as of a date within six months of the possible quote. Once the Company has released the required financial statements, the Company's common stock could become eligible for quotation on the OTC Bulletin Board if a market maker makes an application to have the shares quoted and such application is approved by the Nasdaq Compliance Unit.

*The Audit Committee has also concluded that AFC lacked adequate internal controls and accounting procedures and that the accounting and financial reporting functions investigated needed improvement. The Audit Committee has further concluded that AFC's internal technical accounting expertise was not as strong as it needed to be, and that enhanced training and staffing in the accounting and audit areas were also needed.*

* * *

The Company is currently in discussions with its lenders regarding any amendments to its credit facility that will be necessary due to the status of the ongoing restatement and the audit of its financial statements.

78.     On news of the delisting and admitted lack of internal and accounting controls, the next day, August 15, 2003, shares of AFC stock plummeted once again, this time another $2.52 from the previous days' close, a decrease of over 16%, in

unusually heavy trading volume of over 3 million shares. In addition, AFC's stock was not available on the over-the-counter bulletin board because its financial statements did not meet the necessary guidelines. As a result, AFC's stock continues to trade only on the Pink Sheets under the symbol "afce.pk. "

79.     As a result of the delisting from Nasdaq and the Company's stock trading only on the Pink Sheets, the Company has been and will continue to suffer damages, including but not limited to: (i) a decreased ability to access the capital markets; (ii) an inability (for all practicable purposes) to use the Company's stock as currency for acquisitions; (iii) increased difficulty securing debt financing on favorable terms; and (iv) increased operating costs due to higher interest rates on its existing debt load.

80.     On August 22, 2003 the Company announced it was once again having to amend its credit facility agreements. However, this time the Company's creditors raised the interest rate on the Company's loans by half a percentage point. The Company also was forced to deposit $32 million from the sale of Seattle Coffee Company in a collateral account. The press release issued by the Company on this date entitled "AFC Enterprises Amends Credit Facility; Lenders Agree to Extend Filing Deadlines" provided in relevant part:

> [AFC] today announced that the lenders under its credit facility have agreed to an amendment under which the lenders allow the Company to delay the filing of its Annual Report on Form 10-K until October 31, 2003.

The amendment further allows the Company to delay the filing of its quarterly reports on Form 10-Q for each of the first three quarters of 2003 until December 1, 2003. Under the terms of the amendment, the Company will deposit $32 million, representing approximately 50% of the estimated net proceeds from the sale of certain operations of Seattle Coffee Company on July 14, 2003, in a collateral account. Earlier this year, the Company obtained an amendment to the credit facility permitting it to use 50% of the net proceeds from the sale for stock repurchases, dividends and working capital purposes. These proceeds will be released to AFC for such purposes upon delivery of the annual report for 2002 and the quarterly reports for 2003, provided that the filings are made by the specified dates. If AFC fails to make the filings by the specified dates or if there is any other default under the credit facility on those dates, the deposited amount would be applied as a prepayment against the Company's term loans under the original terms of the credit facility.

Total net proceeds from the sale of Seattle Coffee Company are expected to be $60 to $62 million pending the effect of final adjustments. The Company previously used approximately $32 million of these proceeds to repay term loan indebtedness under the credit facility. The $32 million in proceeds that will be placed in the collateral account under the terms of the amendment represent the remaining unused portion of the expected total net proceeds.

The amendment also provides that, until certain conditions are satisfied, AFC's outstanding debt under the revolving credit facility and term loan A will bear interest at LIBOR plus 2.75% and term loan B will bear interest at LIBOR plus 3.00%, each of which represents a 50 basis point increase over the prior rate. These interest rate spreads will adjust to rates based on the Company's total leverage ratio, upon AFC delivering the required financial reports, AFC certifying that its total leverage ratio based on those financial reports is in compliance with the credit facility, and its bank debt being rated BB- and Ba3 or better by each of S & P and Moody's respectively.

63

81.    On September 19, 2003 the Company announced it was now projecting

to incur $17 to $18 million of non-recurring expenses, an increase from the $14 to $15

million projected in the Company's July 31, 2003 press release.   The additional

expenses related to the ongoing audit, shareholder litigation and expenses related to

the amendments of the Company's credit facility agreement.

82.    On October 30, 2003 the Company announced it had sought and received

yet another amendment (the fifth) to its credit facility and extension of time to file its

re-audited financial statements.   As a consequence, however, the Company's line of

credit was reduced by $10 million and it was forced to use the remaining $32 million

from the sale of Seattle Coffee Company that had previously been placed in a

collateral account to prepay its term loans.  A press release issued by the Company on

October 30, 2003 entitled "AFC Enterprises Amends Credit Facility" provided in

relevant part:

> [AFC] today announced that the lenders participating in its credit facility
> have agreed to an amendment which allows the Company until
> December 15, 2003, for the filing of its Annual Report on Form 10-K.
>
> The amendment also extends the filing time frame requirement for its
> quarterly reports on Form 10-Q for each of the first three quarters of
> 2003 until February 28, 20004. *Under the terms of the amendment,
> AFC will prepay up to $32 million of its term loans, representing
> approximately 50 percent of the total remaining estimated net proceeds
> from the sale of certain operations of Seattle Coffee Company on July
> 14, 2003, which were placed in a cash collateral account under the
> terms of a previous amendment.  The Company's revolving line of*

*credit will also, temporarily, be reduced to $65 million, from $75 million, until it files and delivers all of the required financial statements and demonstrates a total leverage ratio of not greater than 2 to 1, at which time its revolving line of credit will return to its original amount.*

83.    On November 4, 2003 the Company announced it was now projecting to incur $19 to $20 million of non-recurring expenses, an increase from the $17 to $18 million projected in the Company's September 19, 2003 press release. The additional expenses related to the ongoing audit, shareholder litigation and expenses related to the numerous amendments of the Company's credit facility agreement.

84.    Later that day, on November 4, 2003 Bear Stearns issued a report of AFC entitled "AFC Enterprises - Underperform; Business Update -- Little News" that stated in relevant part "There was no new information on the filing of delinquent financial statements...We reiterate our Underperform rating on AFCE shares. We are not publishing estimates on AFC pending the filing of the financial statements."

85.    In a November 5, 2003 conference call with analysts, Defendant Belatti admitted the problems that the restatement and ongoing audit were causing, including AFC being unable to provide guidance for FY 2003 and 2004 until completion of the re-audited financials for 2002.  On the conference call, Belatti stated in relevant part:

> As we previously announced, we are all painfully aware of the fact we're in the process [of] re-auditing 2000, 2001 financial statements and restating our results for the first three quarters of fiscal 2002. As you know, this is necessary in order for us to release our financial

statements for 2002. And until we've finalized those 2002 financial statements we're not going to be able to determine our results for the completed periods of 2003 or issue guidance relating to our performance for the remainder of this year. Until we've finalized the numbers for '02, we simply can't provide meaningful information about '03.

And due to the restatement, we're also not in a position to provide guidance for 2004 until we're able to release the historical financial information for all completed periods which will provide a proper context and baseline for understanding that guidance.

So, accordingly, we have planned to provide full year guidance for '03 and '04 only after the filing of the 2000 10-K and quarterly reports for the first three quarters of '03.

86.     On the same conference call, Belatti also referenced the changes made in

order to enhance AFC's financial reporting and internal controls. These changes were

made only after the filing of the instant lawsuit brought derivatively on behalf of

AFC. Again, Defendant Belatti stated in relevant part:

Suffice it to say that I am certainly disappointed that the audit has taken so long and is not yet completed, but were are in the final stages. And while we just spent an incredible amount of time, energy, and money on the audit process, we have begun to make improvements to our team, our systems and our procedures to ensure that we will be in a better place to report next year more transparently on time in exceptional order.

Across the enterprise, we have added to date six CPA's, we have a new VP of finance, we have a new director of financial reporting, we have a new director of internal controls. We have CFO's and new controllers at our operating companies and we have upgraded our systems. There are new systems coming on stream in the first quarter of 2004 and back office systems have new been installed in about 50 percent of our restaurants, bakeries, and cafes.

\* \* \*

87.     In further derogation of their duties and despite the clear mandate of the

Sarbanes Oxley Act of 2002 and their fiduciary duties to protect AFC's assets and to

police opportunistic behavior by the Company's faithless fiduciaries, defendants have

not yet demanded the disgorgement of the illicitly obtained insider trading proceeds or

the return of the incentive compensation certain defendants, including now departed

Wilkins, received based on falsified financial reports.

88.     The Individual Defendants, particularly management and the members of

the Audit Committee, were responsible for maintaining and establishing adequate

internal controls for AFC and to ensure that the Company's financial statements were

based on accurate financial information.  According to GAAP, to accomplish the

objectives of accurately recording, processing, summarizing, and reporting financial

data, a corporation must establish an internal accounting control structure.  Among

other things, the Individual Defendants were required under GAAP, to:

(1)     Make and keep books, records, and accounts, which, in reasonable
detail, accurately and fairly reflect the transactions and dispositions of
the assets of the issuer; and

(2)     Devise and maintain a system of internal accounting controls
sufficient to provide reasonable assurances that –

(a)     Transactions are executed in accordance with
management's general and specific authorization; and

(b)    Transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

89.    In addition, according to Appendix D to the Statement on Auditing Standards ("SAS") No. 55, management should consider, among other things, such objectives as: (a) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (b) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

90.    According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

91.    AFC's Proxy Statement filed on April 12, 2002 discloses that one of the primary functions of the Audit Committee is to "[o]versee internal systems of accounting controls and procedures."

68

92.    AFC's Audit Committee Charter's "Statement of Policy" provides:

The Committee shall provide assistance to the Board of Directors in fulfilling its oversight responsibility to the Company's stockholders, the investment community, and others relating to the Company's:

> · financial statements and financial reporting process;

> · systems of internal accounting and financial controls;

> · internal audit function;

> · annual independent audit of is financial statements; and

> · legal compliance and ethics programs, as established by management and the Board.

In so doing, it is the responsibility of the Committee to maintain free and open communication between the Committee, independent auditors, the Company's internal auditors, and the Company's management. In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention will full access to all books, records, facilities, and personnel of the Company and the power to retain outside counsel, or other experts for this purpose. It is the intent of the Committee to comply with all applicable rules and regulations governing the Committee, such as those of the Securities and Exchange Commission and the NASDAQ stock exchange.

93.    The fact that AFC will restate its financial statements for FY 2000, 2001 and the first three quarters of 2002 (*eleven quarters and possibly beyond*) is an admission that the financial statements originally issued were false when issued, and that the overstatement of revenues and income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board ("APB") Opinion No. 20, the type of

restatement announced by AFC was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change because it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements, and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, a change in accounting principles used, or to correct an error in previously issued financial statements. AFC's restatement was not due to a change in reporting entity or a change in accounting principles, but rather to errors in previously issued financial statements. Thus, the restatement is an admission by AFC that its previously issued financial results and its public statements regarding those results were false and misleading based on facts which were known or should have been known at the time of their issuance.

94.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, including the following fundamental accounting principles:

a.    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial

70

statements was violated (APB No. 28, ¶10);

      b.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

      c.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

      d.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

      e.    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors'

71

expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

f.    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant in a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

g.    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶79); and

h.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what is purports to represent (FASB Statement of Concept No. 2, ¶¶95, 97).

95.    The Individual Defendants, particularly those who are members of the Audit Committee, not only caused the Company to violate GAAP, but also caused the Company to violate its own Audit Committee Charter by failing to, among other things, properly implement, review, and oversee: (i) the Company's financial

statements and its financial reporting process; (ii) the systems of internal accounting and financial control; (iii) the internal audit function; (iv) the annual independent audit of the company's financial statements; and (vi) the legal compliance and ethics programs as established by management and the Board. The sheer magnitude of the length of the restatement period - eleven quarters- evidences that the Individual Defendants, and particularly the Audit Committee, utterly failed to establish and maintain adequate internal controls for AFC to ensure that the Company's financial results were calculated and recorded in accordance with GAAP.

96.    In fact, as now admitted by the Company *"[t]he Audit Committee has...concluded that AFC lacked adequate internal controls and accounting procedures and that the accounting and financial reporting functions investigated needed improvement. The Audit Committee has further concluded that AFC's internal technical accounting expertise was not as strong as it needed to be, and that enhanced training and staffing in the accounting and audit areas were also needed."*

97.    The Individual Defendants' false statements throughout the Relevant Period enabled certain Individual Defendants to obtain millions of dollars of excessive, unearned compensation, that was based in large part on AFC's falsely reported "results of operations." Between 2000 and 2002, Belatti received in excess of

73

$1.6 million in salary, approximately $815,000 in bonuses in 2000 and 2001, and stock options to buy thousands of shares of AFC stock. During the Relevant Period, Belatti disposed of over $10.6 million worth of AFC stock. Between 2000 and 2002 Wilkins received in excess of $1 million in salary, approximately $562,000 in bonuses in 2000 and 2001, and stock options to buy thousands of shares of AFC stock. During the Relevant Period, Wilkins disposed of over $2 million worth of AFC stock. Between 2000 and 2002, Holbrook received in excess of $1.2 million in salary, approximately $530,000 in bonuses in 2000 and 2001 and stock options to buy thousands of shares of AFC stock. During the Relevant Period, Holbrook disposed of over $6 million worth of AFC stock. While Belatti, Wilkins and Holbrook were selling into the market, they and the other Individual Defendants caused AFC to repurchase millions of dollars of the Company's own stock during the Relevant Period. The rest of the Individual Defendants also received tens of thousands of dollars in compensation and thousands of stock options, many of which, as detailed in ¶¶28-41, were exercised during the Relevant Period while AFC's stock was artificially inflated.

98. By issuing these materially false and misleading statements, or acquiescing in their dissemination and publication, the Individual Defendants breached their fiduciary duties of care, loyalty and good faith, violated GAAP,

74

violated the Company's own Audit Committee Charter, committed gross mismanagement, and abused their control of AFC by knowingly, recklessly, willfully, intentionally, and/or in the absence of good faith:

      a.    Causing AFC to engage in the willful violation of state and federal securities laws and to thereby to engage in the fraud alleged herein;

      b.    Admittedly failing to supervise adequately the financial and operational condition of AFC, specifically in regard to the operations of the Company during the Relevant Period; and concealing from the public the true facts regarding the same;

      c.    Failing to adequately supervise the operations of AFC in a manner consistent with preventing deceptive practices such as the accounting fraud complained of herein;

      d.    Failing to supervise adequately the officers and employees of AFC and failing to ensure that they act with honesty and integrity in order to preserve and enhance AFC's reputation in the business community;

      e.    Exposing AFC to potential liability of millions of dollars, as well as loss of goodwill and its reputation, as a result of their failure to adequately supervise AFC's operations and employees and to prevent their illegal activity;

f.     Failing to institute legal action against those responsible for causing AFC to engage in the deceptive practices in violation of state and federal securities laws and thereby exposing AFC to liability and other financial injury resulting therefrom;

g.     Causing the Company to be liable for the defense and indemnification of those directors and officers responsible for exposing AFC to liability in the above-mentioned securities class actions and other actions;

h.     Failing to ensure that AFC's public filings conformed with the federal and state laws;

i.     Engaging in misrepresentations and inaccuracies upon the investment community by drafting, disseminating or approving the public dissemination of AFC's false financial statements, press releases and other public statements which were materially false and misleading and failed to disclose adverse information about, *inter alia*, the Company's true financial and operational condition and business prospects; and

j.     Failing to sue to recover the millions of dollars in illegal insider trading proceeds obtained by Company insiders who traded on material, non-public, adverse information and for failing to institute insider trading policies to prevent the future usurping of corporate opportunities and insider trading.

99.    The Individual Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at AFC, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with AFC and the financial benefits that flow therefrom.

100.    In order to facilitate and to attempt to conceal their wrongdoing, the Individual Defendants, and particularly the Audit Committee, have admittedly caused AFC to maintain an inadequate system of internal financial and accounting controls such that AFC's financial statements did not reflect the true condition of the Company.

101.    As a result of the Individual Defendants' wrongful and illegal actions, including their abuse of control and participation in the fraudulent scheme, defendants' violations of state and federal laws, and their admitted failure to maintain a system of internal financial and accounting controls adequate to ensure that the financial statements issued by AFC were true and correct in all material respects, AFC has suffered considerable damage to, and drastic diminution in, the value of its assets, goodwill and reputation in the business and financial community.

102.    AFC has and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures include, but are not limited to:

77

a.    Costs incurred as a result of settlements and judgments related to defendants' violation of state and federal laws;

b.    Costs incurred to get the Company's stock relisted on Nasdaq;

c.    Costs related to the ongoing audit process for FY 2000 through 2002, including the hiring of forensic accountants and independent counsel;

d.    Cost related to having to seek numerous extensions to the Company's credit facility agreement; and

e.    Costs and legal fees for defending AFC, its officers and its directors against private litigation arising from the illegal and improper conduct alleged herein.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

103.   The conduct of AFC's directors and officers complained of herein involves a knowing and/or reckless, culpable violation of their obligations as corporate officers and directors, the absence of good faith on their part, and a reckless disregard of their fiduciary duties to the Company and its shareholders, in which they were aware of or should have been aware of a risk of serious injury to the Company. As a result of the foregoing acts of gross mismanagement and breaches of fiduciary duties, AFC has been damaged in excess of several millions of dollars.

104.   The Individual Defendants, in derogation of their duties to AFC and its shareholders, failed to properly manage the affairs of AFC and its subsidiaries and failed to protect the interests of AFC and its shareholders.  The Individual Defendants failed to adequately exercise control as required by law, failed in significant measure to fully inform themselves of the affairs of AFC and its subsidiaries, failed to adequately involve themselves in decision-making, and failed to establish adequate internal controls over management and the affairs of AFC.

105.   The Individual Defendants owed to the Company the highest duties of care, loyalty, and honesty, which require, at a minimum, conducting the Company's affairs in a lawful manner.  The Individual Defendants knowingly and/or recklessly and/or in the absence of good faith breached their fiduciary duties to AFC by, *inter alia*, admittedly failing to establish internal controls sufficient to insure that the Company's business was carried on in a careful manner and that its reputation and financial assets were preserved.  The Individual Defendants further breached their fiduciary duties by failing to disclose to the Company and to its shareholders those facts and circumstances concerning the wrongful conduct complained of herein, which the Individual Defendants had a fiduciary duty to disclose.  To discharge their duties to AFC and its shareholders, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls

and financial affairs of AFC and its subsidiaries.  Specifically, they were required, among other things:

        a.     To manage, conduct, supervise and direct the business and affairs of AFC and its subsidiaries in accordance with applicable law and the Company's charter and bylaws;

        b.     To neither violate, nor knowingly and/or recklessly permit any officer, director, or employee of AFC to violate, applicable state and federal laws, rules and regulations;

        c.     To exercise reasonable control and supervision over the Company's officers and employees;

        d.     To maintain a proper division of authority and responsibility among the Company's officers and directors so as to prevent the dominance of any officer or director in the conduct of its business and affairs;

        e.     To exercise reasonable care in evaluation of the prudence and soundness of policies and practices proposed to be undertaken by AFC;

        f.     To ensure that AFC did not engage in unsafe, imprudent, or unsound practices, and to become and remain informed as to how the Company and its subsidiaries and units were, in fact, operating;

      g.     Upon receiving notice or information of an unsafe, imprudent or unsound practice, to make a reasonable investigation in connection therewith, and to take steps to correct that condition or practice; and

      h.     To act in good faith, in the best interests of the Company, and with the care that an ordinary prudent person would have used under similar circumstances.

106.   The Individual Defendants, acting directly or indirectly, have violated their duty to exercise management stewardship of the Company, in part by admittedly failing to provide adequate internal controls, as well as by failing to conduct AFC's business in a careful and prudent manner.

107.   The Individual Defendants, acting either directly or indirectly, have failed to devise and maintain an adequate system of internal financial and supervisory controls sufficient to provide reasonable assurances that the Company's assets would be safeguarded, its transactions would be executed in accordance with management's general or specific authorization, its business would be conducted in a careful and prudent manner, and its financial results reported in accordance with GAAP. As a result of the lack of such adequate controls, repeated wrongful and illegal acts have occurred that have been greatly detrimental to AFC.

108.   As a direct and proximate result of these failures on the part of the Individual Defendants to establish adequate internal controls, and the other wrongful

acts attributed to them herein, AFC has suffered damages as set forth herein and has been exposed to enormous potential liability.

VI.

DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

**A.     Plaintiffs Are Fair and Adequate Representatives**

109.   Plaintiffs bring this action derivatively in the right of and for the benefit of AFC to redress injuries suffered and to be suffered by the Company as a direct result of the breaches of fiduciary duties, gross mismanagement, and waste of corporate assets by defendants.  AFC is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

110.   Plaintiffs will adequately and fairly represent the interests of AFC and its shareholders in enforcing and prosecuting the rights of the Company.  Plaintiffs were shareholders at the times complained of herein and continue to hold such shares.  Plaintiffs are represented by qualified counsel with substantial experience in corporate governance litigation of this nature.

111.   Plaintiffs' claims are typical and they have no antagonistic interests with other AFC shareholders, and Plaintiffs have no conflicts of interests and will therefore fairly and adequately represent the interests of other similarly situated AFC

82

shareholders.

112.   This shareholders' derivative action is brought to remedy violations of Minnesota law.   The Company is incorporated in Minnesota, hence, Minnesota statutory and common law governs and controls any and all legal issues in this action.

**B.     Demand Futility Allegations**

      **1.      A Majority of the Current Director Defendants Are Alleged to Have Participated in the Wrongs Alleged Herein and to Have Personally Benefited Therefrom**

113.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.   A majority of the ten members who comprised AFC's Board when this action was first commenced, consisting of the Current Director Defendants Belatti, Roth, Spogli, Pennington, Starrett, Holbrook, Figel, Ide, Byrd and Arias are hopelessly conflicted and could not have independently considered a demand to bring the redress requested herein.

114.   First, demand upon the Current Director Defendants to take action against themselves and certain other AFC executives for their intentional and/or reckless conduct as alleged herein, would have been futile because of their extensive personal, professional and financial relationships.   Not only would this require them to investigate and bring claims against themselves for their own misconduct, their actions to date prove conclusively that they will not take action.

115.   As set forth below in particular detail, and at ¶¶28-37 herein, demand is excused because this Complaint alleges with particularity that all, or at the very least a majority of the Current Director Defendants, intentionally and/or recklessly and/or in the absence of good faith breached their fiduciary duties by failing to oversee AFC's most basic and fundamental financial controls.   Each of the Current Director Defendants, or at least a majority, including the Audit Committee, Executive Committee, those Defendants who signed the false financial statements and Registration Statements, and the inside sellers, is alleged to have participated in the unlawful acts alleged herein and to have personally benefited therefrom.

116.   As detailed herein and below all, or at the very least, a majority of the Current Director Defendants participated in, encouraged, sponsored or approved many of the acts and omissions or were on notice of and/or recklessly and/or in the absence of good faith disregarded the wrongdoing complained of herein by failing to oversee AFC's most fundamental accounting controls.   It was known, to defendants, at all times relevant to the allegations raised herein, that the Current Director Defendants directed or permitted AFC to engage in the wrongful acts complained of herein and to cover up their mismanagement of AFC's affairs in connection with the Company's accounting which were known.   Consequently, each director has been implicated in direct, active misconduct causing harm to AFC.   By actively participating in or failing

84

to disclose the above-mentioned activities, the Current Director Defendants violated their fiduciary duties owed to the Company and its shareholders.

117.   Additionally, the members of the Audit and Executive Committee had a responsibility to maintain the integrity of AFC's internal audit functions and fiduciary activities, and to assure that AFC's internal controls were adequate.  The wrongful activities alleged herein, occurred, in whole or in part, because, *as admitted*, the Company's internal and accounting controls were wholly inadequate.  The members of the Audit and Executive Committee knew that the supervisory and monitoring controls for the Company were inadequate and that there were no internal controls. They thereby knowingly or recklessly permitted the alleged misconduct to take place; in other words, they knew of the misconduct described herein, permitted it to occur, and deliberately looked the other way.

118.   Indeed, a majority of the Board, the Audit Committee, the Executive Committee, those Defendants who signed the false financial statements, and other inside directors specifically participated in the wrongs alleged herein and breached their fiduciary duties by, among other things: causing the Company to violate GAAP; causing the Company to issue false and misleading financial statements and registration statements; causing the Company to violate its own Audit Charter; and by failing to make any effort to establish and maintain adequate internal accounting

controls for AFC to ensure the Company's financial results were calculated and recorded in accordance with GAAP, a failure the Company previously admitted. In addition, as discussed above, a majority of the Current Director Defendants, Belatti, Roth, Spogli, Pennington, Starrett and Holbrook, benefited from the wrongs alleged herein by engaging in massive self-dealing insider selling. These directors would never authorize a suit against their fellow directors (or the investment firms Freeman Spogli and Penman) because it would bring scrutiny to their own stock sales. Moreover, each of the Current Director Defendants signed one or both of the false and misleading Registration Statements and Prospectus, and the admittedly false Form 10-K was signed by each Current Director Defendant. Thus, because the Audit Committee, Executive Committee, inside sellers and those who signed the false financial statements and registration statements - a clear majority of the Board - are defendants and are alleged to have participated in the wrongs alleged herein, demand is excused on this basis alone.

119.   In addition, Belatti participated by engaging in insider selling, and as discussed below, by virtue of his status as CEO, violated the Sarbanes-Oxley Act as detailed below. Moreover, as Chairman, CEO, interim CFO and Chairman of the Executive Committee, Belatti knew that the supervisory and monitoring controls for the Company were inadequate, that there were no internal controls, and he thereby

knowingly or recklessly permitted the alleged misconduct to take place; in other words, he knew of the misconduct described herein, permitted it to occur and deliberately looked the other way.

120.  In addition, Belatti, Roth and Spogli, as members of the Executive Committee, had the legal responsibility to monitor and assure AFC's day-to-day compliance with all applicable laws, rules and regulations.  Despite their knowledge or reckless disregard of AFC's improper management of its operations and financial condition, these defendants knowingly and/or recklessly failed to take appropriate corrective or preventive steps.

121.  The acts complained of herein by the Current Director Defendants constitute violations of law and breaches of the fiduciary duties owed by AFC's Board, and these acts are incapable of ratification.

122.  The participation of the Current Director Defendants, or at the very least a majority, is further evidenced in that AFC has been exposed to significant losses, yet the Current Director Defendants have taken no action, against themselves or other present or former employees of the Company who were responsible for that wrongful conduct, to attempt to recover for the Company any part of the damages the Company suffered thereby and, in fact, have permitted defendants to continue to be paid huge sums in order to conceal their complicity in this disaster.  A majority of the Current

Director Defendants also violated their fiduciary duties by engaging in self-dealing insider sales, as detailed in ¶¶28-32, 38, while the Company's stock was artificially inflated as a result of the wrongs complained of herein.

123. Therefore, as the Current Director Defendants are defendants in this action and all are alleged with particularity to have participated in the unlawful acts alleged herein (or at the very least the Audit Committee, Executive Committee, inside sellers, those who signed the false financial statements and registration statements, and thus a majority of the Board), demand is excused as futile.

### 2. The Current Director Defendants Failed to Fully Inform Themselves to the Extent Reasonably Appropriate under the Circumstances

124. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein. As now admitted, the Current Director Defendants failed to have sufficient controls and procedures in place to prevent harm to the Company. They allowed the accounting irregularities to go on for eleven quarters, eventually forcing the Company to announce it will have to restate for FY 2000, 2001 and for the first three quarters of 2002, and representing one of the longest restatement periods in recent memory. The Current Director Defendants, and especially the Audit Committee, Executive Committee and inside directors (a majority of the Board), failed in significant measure to fully inform themselves of the affairs of

AFC, failed to adequately involve themselves in decision-making, and failed to establish adequate internal controls over management and the affairs of AFC, particularly with respect to the Company's financial statements and its financial reporting process.

125.   The sustained and systematic failure of the Current Director Defendants to exercise oversight and to reasonably inform themselves to the extent reasonable under the circumstances, especially given that the failure, which went undiscovered by the directors, involves a scheme of such significant magnitude and duration (eleven quarters) demonstrates demand is futile.

### 3. The Current Director Defendants Are Not Protected by the Business Judgment Rule

126.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.  During the Relevant Period, the Current Director Defendants caused the Company to issue numerous false and misleading financial statements in violation of GAAP.  The fact that AFC will restate its financial statements for FY 2000 through the first three quarters of 2002 is an admission that the financial statements originally issued were false when issued, and that the overstatement of revenues and income was material.

127.   Because the dissemination of false and misleading financial statements can never be deemed to be the product of a valid exercise of business judgment,

89

demand is excused.

128.   Furthermore, the Current Director Defendants' knowing participation in conspiracy, and/or aiding and abetting of the unlawful activities alleged herein was not – and could never be – the product of a valid exercise of business judgment, and the wrongful activities at issue in this shareholders' derivative case are not sheltered from scrutiny by the so-called "business judgment rule."

129.   AFC has been exposed to significant losses due to the Company's illegal scheme to hide the true financial and operational condition of the Company in order to support the value of its stock, yet the Current Director Defendants have taken no action against themselves or other present or former employees of AFC who were responsible for that wrongful conduct in an attempt to recover for the Company any part of the damage AFC suffered thereby.

130.   The conduct of the Current Director Defendants and resulting harm to AFC has resulted from an obvious and prolonged failure to exercise oversight or supervision by the AFC Board.

131.   The wrongful acts complained of and the expenditure of funds complained of constitute violations of fiduciary duties owed by each member of the AFC Board; and, therefore, these acts are incapable of ratification.

132.   The acts complained of herein constitute violations of law and breaches of the fiduciary duties owed by the Current Director Defendants to AFC and its shareholders, and these acts are incapable of ratification.

133.   The acts complained of herein are wrongful and the expenditure of funds complained of constitute a waste of AFC's corporate assets and, thus, are acts incapable of ratification.

### 4.   A Majority of the Current Director Defendants Are Neither Independent Nor Disinterested

134.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.  The Current Director Defendants cannot be relied upon to reach a truly independent decision as to whether to commence the demanded legal actions against themselves and the officers and employees responsible for the misconduct alleged in this Complaint because, *inter alia,* the Board is totally dominated by defendants Roth and Spogli, principals of Freeman Spogli, AFC's largest shareholder, Figel and Starrett, who are also affiliated with Freeman Spogli, Belatti, who has an extensive and long-term relationship with Freeman Spogli and its affiliates, and Pennington who, along with Penman, also enjoy substantial control over AFC, all of whom were personally and directly involved in the misconduct alleged, and each of whom approved all of the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.   This

domination of the Board by these defendants has impaired its ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether or not to accept Plaintiffs' demands.

135.   In order to bring this action for breach of their fiduciary duties, the members of AFC's Board would be required to sue themselves and/or their fellow directors and allies in the top ranks of the Company who are their good friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.  Therefore, the Current Director Defendants would not be able to vigorously prosecute any such action.

136.   Even Ide, Byrd and Arias, the only director defendants claimed to be truly outsiders, receive payments, benefits and other emoluments by virtue of their Board membership and their control of AFC.  Thus, they have benefited from the wrongdoing alleged herein and have engaged in such conduct in order to preserve their positions of control and the perquisites thereof, and are, therefore, incapable of exercising independent objective judgment in deciding whether or not to bring this action. The Board members also have close personal and business ties with each other and are, consequently, interested parties who cannot in good faith exercise independent business judgment to determine whether or not to bring this action against themselves.

### 5. The Current Director Defendants' Conduct Was so Egregious on its Face That It Is Not Protected by the Business Judgment Rule

137. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein. The Current Director Defendants' conduct was so egregious on its face that it could not have been the product of sound business judgment. The Company has admitted it lacked adequate internal and accounting controls and persons with sufficient accounting knowledge. The accounting irregularities alleged herein were covered-up and/or went undiscovered for eleven quarters, eventually resulting in the Company admitting twice it will have to restate its financial statements for FY 2000 and 2001 and for the first three quarters of 2002. Had the Current Director Defendants, and particularly the Audit Committee, Executive Committee and management, even minimum internal controls in place, the Company would not be subject to the damages sustained as alleged herein. Thus, the Current Director Defendants' conduct was so egregious on its face that it could not have been the product of sound business judgment.

138. In addition, and as a result, the Current Director Defendants face a substantial likelihood of liability in connection with their intentional and/or reckless failures to ensure that AFC had adequate internal controls and complied with applicable laws, especially with their knowledge or acquiescence in AFC's repeated

misrepresentations to the financial markets.

139.   As specified in detail herein, the Current Director Defendants were, or at the very least should have been, aware of critical facts regarding the Company's accounting and that the Board was engaging in business practices that violated its fiduciary obligations to the shareholders.

140.   Despite their knowledge of these facts, the Current Director Defendants intentionally and/or recklessly allowed the Company to disseminate false and misleading financial information to the investing public.

141.   The Current Director Defendants undertook this course of conduct with intentional and/or reckless breach of their fiduciary duties because they were afraid that taking the drastic action that was necessary to correct and address the severe lack of any internal controls would: (a) harm the market price of AFC stock; (b) result in the loss of goodwill in the investing community; and (c) jeopardize their personal reputations and financial interests.

### 6.   Insured Versus Insured Exclusion

142.   Upon information and belief, the Current Director Defendants are protected against personal liability for their acts of waste and breach of fiduciary duty alleged in this Complaint by very substantial directors' and officers' liability insurance, which they caused the Company to purchase for their protection and which has been

paid for with corporate funds (*i.e.*, monies belonging to AFC's shareholders). Upon information and belief, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, however, the applicable liability insurance policies covering defendants in this case contain provisions that eliminate coverage for ***any*** action brought directly by AFC against these defendants; such provisions are known, *inter alia*, as the "***insured versus insured exclusion***." As a result, if AFC's directors were to sue themselves or certain of the Company's officers, there would be no applicable insurance protection and, thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery for the multi-million dollar damages it has sustained.

## SUBSTANTIAL DAMAGES TO AFC

143. As a result of the foregoing actions of the Individual Defendants, AFC has suffered and will continue to suffer substantial, severe, irreparable damages, including, but not limited to:

> a.      Damages resulting from the Company's stock being delisted from Nasdaq;

> b.      Damages resulting in the Company incurring $19 to $20 million in

non-recurring expenses in 2003 relating to the ongoing audit process for FY 2000 and 2002, the shareholder litigation, and expenses related to the amendment of the Company's credit facility;

      c.     Damages caused by the Company's suspension of domestic franchising of its various brands, including Popeyes Chicken & Biscuits, Church's Chicken and Cinnabon;

      d.     Damages caused by the Company's being forced to seek numerous extensions on its credit facility agreement eventually resulting in creditors raising the interest rate on the Company's loans and the Company having to pay approximately $64 million from the proceeds of the sale of the Company's franchise, Seattle Coffee Co., to pay term loan indebtedness;

      e.     Damages caused by exposing the Company to hundreds of millions of dollars in potential liability for violations of federal and state law which will cost the Company millions to defend and hundreds of millions more to settle;

      f.     Damages caused by the Company's forced expenditure of funds and employee hours related to the restatement and ongoing re-audit process, including the hiring of forensic accountants and independent counsel, which defendants admit has been a big distraction to management and the entire operation; and

g.     Severe and irreparable damage to AFC's credibility, reputation, and goodwill, especially in the analyst and investing community.

VII.

<u>COUNT I</u>

**Breach of Fiduciary Duties Against All Individual Defendants**

144.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

145.    The Individual Defendants are fiduciaries of AFC and of all of its shareholders, and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently. A fiduciary duty is the highest duty imposed by law. This count is asserted based upon the Individual Defendants' acts in violation of Minnesota common law, which acts constitute breach of fiduciary duty.

146.    Each of the Individual Defendants actively participated in and/or approved the Company's improper practices, as alleged herein. These actions violated the Individual Defendants' fiduciary duties and could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests. The Individual Defendants violated their duty of care and loyalty to AFC and negligently and/or recklessly and/or intentionally violated their fiduciary

97

duties to the Company and its shareholders.

147.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AFC has sustained damages, as alleged herein.

## COUNT II

**Derivative Claim for Abuse of Control Against All Individual Defendants**

148.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

149.   The Individual Defendants' conduct constituted an abuse of their ability to control and influence AFC, for which they are legally responsible.

150.   By reason of the foregoing, AFC has been damaged, and will continue to sustain damages.

## COUNT III

**Derivative Claim for Gross Mismanagement Against All Individual Defendants**

151.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

152.   As detailed more fully herein, the Individual Defendants each have and had a duty to AFC and its shareholders to prudently supervise, manage and control AFC's operations.

153.   The Individual Defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of AFC in a manner consistent with the operations of a publicly held corporation.

154.   By subjecting AFC to the unreasonable risk of liability, by engaging in the conduct described herein and/or by concealing this conduct and its effect on AFC's profitability, the Individual Defendants breached their duties of due care and diligence in the management and administration of AFC's affairs and in the use and preservation of AFC's assets.

155.   The Individual Defendants caused the Company to engage in this misconduct and were aware of the problems and probable losses associated therewith. During the course of the discharge of their duties, these defendants knew or should have known of the unreasonable risks, yet these defendants caused AFC to engage in this scheme that these defendants knew had an unreasonable risk of material loss to the Company, thus breaching their duties to both AFC and its shareholders. As a result, the Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of AFC and its assets which the defendants knew would likely lead to material and substantial restatements and losses.

156.   As a proximate result thereof, AFC has been damaged and will continue to suffer damages, and is entitled to an award of punitive damages against the defendants.

COUNT IV

**Derivative Claim for Waste of Corporate Assets Against the Individual**

**Defendants**

157.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

158.   As a result of the foregoing conduct, the Individual Defendants have caused AFC to waste valuable assets and have subjected the Company to potential material liability for securities fraud, possibly reaching hundreds of millions of dollars in damages as well as significant legal defense fees.

159.   As a result of the foregoing conduct, the Individual Defendants caused AFC to spend Company money on an internal investigation and waste $19 to $20 million in non-recurring expenses related to the ongoing re-audit of its financial statements issued in FY 2000-2002. The Company has also wasted funds relating to the numerous amendments to its credit facility agreement and has and will continue to waste Company funds in attempting to get the Company's common stock re-listed on Nasdaq. Finally, the Company wasted $32 million from the proceeds of the sale of

the Company's franchise, Seattle Coffee Co., to pay term loan indebtedness - money it could have otherwise been using for legitimate business purposes.

160.    By reason of the foregoing, AFC has been damaged, and will continue to sustain damages.

## COUNT V

### Unjust Enrichment Against Defendants Belatti, Holbrook, Wilkins, Moddelmog, Luther and Kaplan

161.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

162.    As alleged herein, Belatti, Holbrook, Wilkins, Moddelmog, Luther and Kaplan, from 2000 through 2002, received substantial bonuses plus options to purchase AFC common stock based on the Company's materially overstated financial performance.

163.    As a result of the wrongful conduct of Belatti, Holbrook, Wilkins, Moddelmog, Luther and Kaplan and the other Individual Defendants, Belatti, Holbrook, Wilkins, Moddelmog, Luther and Kaplan were unjustly enriched at the expense of the Company.

164.    The Company is entitled to disgorgement of all bonuses, stock options, and the proceeds from the sales of their shares of AFC stock received by Belatti, Holbrook, Wilkins, Moddelmog, Luther and Kaplan as a result of their wrongful

conduct.

## COUNT VI

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties, for Insider Selling and Misappropriation of Information**

165. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

166. As alleged herein, certain of the Individual Defendants, Freeman Spogli and Penman, engaged in insider selling during the Relevant Period.

167. At the time of the stock sales set forth herein, the Insider Selling Defendants knew, or should have known the information described above, and sold AFC common stock on the basis of such information.

168. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold AFC common stock.

169. At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of AFC common stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith and a violation of federal and state securities laws.

102

170.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

171.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold AFC common stock on the basis of such information.

## COUNT VII

### For Forfeiture of Bonuses and Illicit Profits Against Defendants
### Belatti and Wilkins

172.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if set forth fully herein.

173.   AFC will be required to restate previously reported financial results for 2000, 2001, and the first three quarters 2002.

174.   Pursuant to the Sarbanes-Oxley Act of 2002, §304, because AFC wrongfully overstated its earnings during these periods and will be required to prepare an accounting restatement for FY 2000 and 2001 and the first three quarters of 2002 due to material noncompliance with GAAP, Defendant Belatti, as AFC's CEO, and Defendant Wilkins, as AFC's former CFO, are required to disgorge all bonuses or

103

other incentive-based or equity-based compensation received by them from AFC between 2000 and 2002 and the profits they realized from the sale of AFC securities during that period.

175.   Defendants Belatti and Wilkins are also liable to plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of AFC.

## PRAYER

WHEREFORE, plaintiffs demand judgment as follows:

(1)   Declaring that the Individual Defendants, and each of them, have committed breaches of their fiduciary duties to AFC;

(2)   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

(3)   Awarding disgorgement in favor of AFC of all bonuses and stock options unjustly received by Defendants Belatti, Wilkins and Holbrook, as well as all ill-gotten gains from defendants' insider trading;

(4)   Declaring Defendant Belatti, as AFC's CEO and Defendant Wilkins, as AFC's CFO, are required to reimburse AFC for all bonuses or other incentive-based or equity-based compensation received by them from AFC between 2000 and 2002 and the profits they realized from the sale of AFC securities during that period for

104

violation of §304 of the Sarbanes-Oxley Act of 2002;

(5)   Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(6)   Granting such other and further relief as the Court deems just and proper, including injunctive relief.

Plaintiffs demand a trial by jury on all issues so triable.

Steven J. Estep
Georgia Bar No. 250450
COHEN, COOPER, ESTEP & MUDDER
3350 Riverwood Parkway
Suite 2220
Atlanta, GA 30339
Telephone: (404) 814-0000
Fax: (404) 816-8900

Plaintiffs' Liaison Counsel

GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201
Telephone: (615) 244-2202
105

Fax: (615) 252-3798


_____

BRIAN J. ROBBINS
JEFFREY FINK
ROBBINS UMEDA & FINK, LLP
1010 Second Avenue
Suite 2360
San Diego, CA 92101
Telephone: (619) 525-3990
Fax: (619) 525-3991


_____

JAMES G. STRANCH
BRANSTETTER,KILGORE, STRANCH &
JENNINGS
227 Second Avenue North
Nashville, TN 37201
Telephone: (615) 254-8801
Fax:  (615) 255-5419

Plaintiffs' Executive Committee

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for the opposing party in the foregoing matter with a copy of **Consolidated Amended Derivative Complaint For Breach Of Fiduciary Duties, Abuse Of Control, Gross Mismanagement, Waste Of Corporate Assets, Unjust Enrichment, Breach Of Fiduciary Duties For Insider Selling And Misappropriation Of Information, And For Violations Of The Sarbanes-Oxley Act Of 2002** by depositing a copy of the same in the United States Mail, postage prepaid, as follows:

M. Robert Thornton, Jr.
Michael R. Smith
John P. Brumbaugh
King & Spalding
191 Peachtree Street, NE
Atlanta, GA 30303

This 24th day of November, 2003.

Steven J. Estep